## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

V.

AMILCAR GOMEZ

CASE No.  06-613 (S-2)(SJ)

---

## AMILCAR GOMEZ'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO VACATE, SET ASIDE, OR CORRECT JUDGMENT AND SENTENCE UNDER 28 U.S.C. § 2255

Edward Irizarry
Attorney at Law
260 Madison Avenue
New York, New York 10016
(646) 216-2127

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES …..................................................iii
TABLE OF EXHIBITS ……………………….....………....vii

FACTS
    I.    GOMEZ'S DETENTION AND
        INTERROGATION……………………..….…....1
    II.   GOMEZ'S RIGHT TO TESTIFY…………….....9
    III.  ADRIAN SORIANO……………………….....9
    IV.  GOMEZ'S APPEAL………………………….....9

ARGUMENT…………………………….…….…..…...10

    I.     TIMELINESS OF CLAIMS…………………..10

    II.    TRIAL COUNSEL WAS INEFFECTIVE FOR
         FAILING TO CONDUCT DISCOVERY AS TO
         GOMEZ'S STATEMENTS AND FOR FAILING TO
         MOVE TO SUPPRESS GOMEZ'S ALLEGED
         CONFESSIONS……………………………….…10

    III.  TRIAL COUNSEL WAS INEFFECTIVE IN
         FAILING TO PROPERLY INFORM GOMEZ OF
         HIS RIGHT TO TESTIFY AND FOR FAILING TO
         EFFECTUATE GOMEZ'S DECISION TO
         TESTIFY…………......……………………………14

    IV.  TRIAL COUNSEL WAS INEFFECTIVE FOR
         FAILING TO INTERVIEW THE WITNESS
         SORIANO, FAILING TO CALL HIM TO TESTIFY,

AND FAILING TO INTERVIEW ANY OF THE
WITNESSES TO THE MARTINEZ STABBING....21

V.    GOMEZ IS ACTUALLY INNOCENT OF THE
CRIMES CHARGED AGAINST HIM IN THE
INDICTMENT.............................................22

VI.   DEFENSE COUNSEL WAS INEFFECTIVE FOR
FAILING TO FILE DISCOVERY MOTIONS WITH
RESPECT TO GOMEZ'S CIVIL DEPORTATION
PROCEEDING AND THE GOVERNMENT
VIOLATED ITS DISCOVERY OBLIGATIONS
WITH RESPECT TO THOSE HEARINGS UNDER
FRCP RULE 16............................................23

VII.  DEFENSE COUNSEL WAS INEFFECTIVE FOR
FAILING TO CONFRONT THE WITNESSES
AGAINST GOMEZ.......................................24

VIII. DEFENSE COUNSEL WAS INEFFECTIVE FOR
FAILING TO DEMAND THAT BLOOD OR
BIOLOGICAL EVIDENCE RECOVERED FROM
THE CRIME SCENE AND STABBING VICITIMS
BE PRODUCED AND ANALYZED; AND GOMEZ
MOVES FOR SUCH ANALYSIS......................25


CONCLUSION ...................................................... 25

iii

## TABLE OF AUTHORITIES

Cases

Page

*Bong Youn Choy v. Barber,* 279 F.2d 642 (9th Cir. 1960)....10,12

*Bram* v. *United States,* 168 U.S. 532 (1897)...................10,13

*Chang v. United States,* 250 F.3d 79, 85 (2d Cir. 2001)........8,15

*Eze v. Senkowski,* 321 F.3d 128 (2nd Cir. 2003)...................21

*Haynes* v. *Washington,* 373 U.S. 503 (1963) ............8,10,11,13

*In re Garcia,* 17 I. & N. Dec. 319 (BIA 1980).....................13

*Johnson v. Zerbst,* 304 U.S. 458 (1938)............................15

*Jones v. Barnes,* 463 U.S. 745 (1983)...............................15

*Kimmelman v. Morrison,* 477 U.S. 365 (1986)...................11

*Lego v. Twomey,* 404 U.S. 477 (1972)..............................17

*Lindstadt v Keane,* 239 F.3d 191 (2nd Cir. 2001)..................21

*Lopez-Mendoza,* 468 U.S. at 1051...................................13

*Lyons* v. *Oklahoma,* 322 U.S. 596 (1944)..................10,13,14

iv

*Martin v. United States,* 166 F.2d 76 (4th Cir. 1948)............11

*Matter of Garcia,* 17 I. & N. Dec. 319 (BIA 1980)..............13

*Miranda v. Arizona,* 384 U.S. 436 (1966)........................13

*Mohamed Raja v. Mu,* 544 F.3d 427 (2d Cir. 2008).............12

*New York v. Hill,* 528 U.S. 110 (2000)...........................15

*Owens v. United States,* 483 F.3d 48 (1st Cir. 2007)............20

*Pavel v. Hollins,* 261 F. 3d 210 (2d Cir. 2001)...................21

*Padilla v. Kentucky,* 130 S.Ct. 1473 (2010)......................13

*Presley v. Georgia,* 558 U.S. 209 (2010)..........................9

*Rock v. Arkansas,* 483 U.S. 44 (1987)............................14

*Rompilla v. Beard,* 545 U.S. 3749 (2005)........................21

*Rosemand v. United States,* 572 U.S. ____ (2014).......14,17,22

*Saltys v. Adams,* 465 F.2d 1023 (2d Cir 1973)...................14

*Strickland v. Washington,* 466 U.S. 688 (1984).................14

*Tague v. Louisiana,* 444 U.S. 469 (1980)........................13

v

*United States Barrow,* 400 F.3d 109 (2d Cir. 2005)..............24

*United States v. Birnbaum,* 337 F.2d 490 (2d Cir. 1994).........24

*United States v. Gomez,* 705 F.3d 68 (2d Cir. 2013).............10

*United States v. Gomez,* 134 S.Ct. 61 (U.S. 2013)..............10

*United States v. Oluiswualo,* 605 F.3d 124 (2d Cir. 2005)......24

*United States v. Teague,* 908 F.2d 752 (11 Cir. 1990)...........15

*United States v. Thomas,* 239 F.3d 163 (2d Cir. 2001)..........23

*Unites States v. Vargas,* 920 F.2d 167 (2d Cir. 1990)...........15

*United States v. Williams,* 323 F.2d 65 (2d Cir. 1963)...........8

*Wiggins v. Smith,* 539 U.S. 510 (2003)...........................21

*Ziang Sung Wan* v. *United States,* 266 U.S. 1 (1924).........10,13

vi

Constitutional Provisions, Statutes and Rules

U. S. Const. Amend. V ……………………..…....1,6,12

U. S. Const. Amend. VI ………………………..………1

Innocence Protection Act of 2004, 18 U.S.C. § 3600…25

Fed. R. Crim P.:

    Rule 16…………………………………………….23

vii

## TABLE OF EXHIBITS

| No. | Exhibit | Description |
|---|---|---|
| 1 | Exhibit A | Affidavit of Amilcar Gomez (9/19/2014) |
| 2 | Exhibit B | <ul><li>Application for Temporary Protected Status of A. Gomez</li><li>Application for Employment Authorization of A. Gomez</li><li>USCIS Approved Employment Authorization of A. Gomez</li></ul> |
| 3 | Exhibit C | ICE Special Agent Erin Keegan's testimony to the Grand Jury, Grand Jury Minutes, Pg. 23 (6/21/2006) |
| 4 | Exhibit D | Form I-213, Record of Deportable/Inadmissible Alien |
| 5 | Exhibit E | Affidavit of Amilcar Gomez before ICE Special Agent Erin Keegan (4/19/2005) |
| 6 | Exhibit F | Grand Jury Dismissal |
| 7 | Exhibit G | Excerpts from Trial Transcript, Book II of V (3/31/2009): Pages 223-224; 232; 346; 367; 379 |
| 8 | Exhibit H | Statement of A. Gomez  (3/1/2003) |
| 9 | Exhibit I | <ul><li>Map of the Crime Scene with designated areas of recovered Blood Samples</li><li>Pages from Autopsy Report (Forensic Biology)</li></ul> |
| 10 | Exhibit J | <ul><li>Memo from SA Erin Keegan to Immigration Officials (11/1/2005)</li></ul> |

viii

| No. | Exhibit | Description |
| --- | --- | --- |
|  |  | • USCIS Denial Decision for A. Gomez's Application for Employment Authorization (11/28/2005) |
| 11 | Exhibit K | Gomez GED Enrollment |
| 12 | Exhibit L | Affidavit of trial counsel, Scott Yale Auster (2/22/2011) |
| 13 | Exhibit M | Excerpts from Trial Transcript, Book I of V (3/30/2009): Pages 2-6; 158; 166; 194 |
| 14 | Exhibit N | Affidavit of Adrian Soriano (7/27/2013) |
| 15 | Exhibit O | Excerpts from Trial Transcript, Book III of V (4/1/2009): Pages 450-453 |
| 16 | Exhibit P | Excerpts from Trial Transcript, Book V of V (4/3/2009): Pages 780-789 |
| 17 | Exhibit Q | Complaint Follow Up, Medical Examiner Case |
| 18 | Exhibit R | Excerpts from Trial Transcript, Book IV of V (4/2/2009): Pages 582-583; 687; 691-692; 695 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

V.

AMILCAR GOMEZ

CASE No. 06-613 (S-2)(SJ)

### AMILCAR GOMEZ'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO VACATE, SET ASIDE, OR CORRECT JUDGMENT AND SENTENCE UNDER 28 U.S.C. § 2255

Amilcar Gomez, through undersigned counsel, hereby respectfully moves this Court pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct the judgment and sentence entered against him in *United States v. Gomez*, Criminal No. 06-613 (S-2)(SJ).  More specifically, Gomez seeks to have his conviction and sentence vacated on the grounds of his actual innocence, the ineffective assistance of counsel, and the violation of his Fifth and Sixth Amendment rights under the United States Constitution.  Amilcar Gomez also moves this Court pursuant to 18 U.S.C. §3600(a) for an order authorizing him to inspect all physical evidence in the government's custody for the presence of biological evidence, and to subject all biological evidence selected by the defendant to additional DNA testing.

### FACTS

### I. *GOMEZ'S DETENTION AND INTERROGATION*

In October of 2002, Amilcar Gomez sought and retained counsel to prevent his deportation to El Salvador by obtaining Temporary Protected Status (TPS) and employment authorization so that he could remain in the United States.[1]  Gomez feared for his life should he be deported to El Salvador, a country whose refugees deserve greater protection than existing Asylum programs according to the U. S. Government.  In the U.S. without documentation, Gomez was informed by counsel that the TPS status and employment authorization were granted and that counsel would file the necessary renewal forms. *See*

---

[1] TPS is a temporary immigration status granted certain individuals in the U.S. to protect them from having to return to an actively dangerous situation in their home country. *See* Immigration and Nationality Act § 244.

1

Exhibit A, Gomez Affidavit, Exhibit B, TPS renewal application. After submitting the TPS application, receiving work authorization, and applying for renewals, Gomez began working, and supporting himself and his family in Queens, New York.

On or about April 15, 2005, after leaving his home for work in the morning, Gomez was called on his cell phone by his mother and told that he must return home. U.S. Immigration and Custom Enforcement (ICE) agents Erin Keegan and Celestino Martinez had entered Gomez's home, falsely told his mother that they were probation officers, and that Gomez would have to return home. When Gomez returned home, he was arrested by the agents who threatened to immediately deport him for entering the country illegally and for committing two misdemeanor offenses. These convictions, Keegan told Gomez, mandated Gomez's deportation, although they stemmed from guilty pleas where Gomez's court-appointed lawyer failed to inform him of the immigration consequences of his pleas.

Keegan, who was then involved in a gang investigation in Queens, would later admit under oath that during the course of her criminal investigations "individuals provide information because they might be deported." See Exhibit C. Keegan began her investigation in or about 2004 and believed Gomez was a member of the MS13 gang she was investigating when she apprehended him. When Keegan encountered Gomez she filled out a Form I-213 (Record of Deportable/Inadmissable Alien Form), and listed the reason for apprehending him as his misdemeanors offenses. The I-213 form was dated April 15, 2005, and indicated that Gomez was fingerprinted. On the form, contrary to information given to Gomez and on his TPS renewal forms, Keegan indicated Gomez's TPS application had been denied. *See* Exhibit D, Form I-213.

As he was apprehended in his home and held under the threat of deportation, Gomez asked to speak with his attorney, and told Keegan that his attorney filed his TPS paperwork, and obtained his work authorization. Gomez asked Keegan for access to a phone so that he may call his counsel and refused to speak to Keegan when she questioned him about gang-activity in Queens, New York. Keegan denied his request. When Gomez stressed what he believed was his TPS status, Keegan ignored Gomez and simply told him that his convictions mandated deportation.

2

As he was driven out of the borough of Queens, Gomez repeatedly asked to speak to his lawyer, and refused to make any further statements. Gomez was then threatened with immediate deportation by the agents unless he cooperated and assisted them in their criminal investigation. After Gomez was held captive in cells at various locations, the agents again interrogated Gomez on the 19th of April, 2005.

On the 19th of April, a desperate Gomez, away from his home and family, stated his name, date of birth, details about his entry into the U.S., that he had applied for TPS status, and that he was in fear of returning to El Salvador. Gomez indicated his refusal to make any further affirmative statements without his lawyer present by drawing a diagonal line from the blank bottom portion of his Affidavit statement page to the end of the last sentence of his statement, and continued to ask to see his attorney. He then signed along the diagonal line. The Affidavit stated it was a full record of his interrogation on the 19th of April *See* Exhibit E.

Despite his limited statement and continued demand for counsel, the agents continued interrogating Gomez, and again asked him if he was a member of the MS13 gang as his prior misdemeanor arrests involved the arrest of suspected MS13 gang members. The agents told Gomez that he must help their investigation or be deported. Exasperated, confused, afraid of deportation, and denied counsel, Gomez signed documents presented to him by the agents, admitted that he was previously involved in the gang but that he had not been active for some time as he sought legal employment and strived to better his life. He explained that he was previously involved with the gang members because many of them shared his culture, language, and background, and that he often felt lonely in a foreign country. Now, Gomez explained, he sought to work, continue his education, and better his life.

When the agents asked Gomez about the stabbing deaths of two rival gang members on March 1, 2003, after a gang fight for which Gomez had been arrested and charged before a Grand Jury dismissed all of charges against him, Gomez indicated that he remembered very little of the night in question as he was drunk and could hardly walk. The State Grand Jury heard the testimony of the officers who observed the stabbing of one Pedro Martinez, and promptly dismissed all charges against Gomez. When the agents asked Gomez to help them apprehend the assailants and in return he would not be deported, Gomez

refused, because, as he said, he could remember very little of the night in question. According to Keegan's testimony at trial, which included no information about the threat of deportation or her promise not to deport Gomez if he helped her investigation, Gomez freely cooperated and volunteered this information.[2]

After being arrested and questioned in Queens, then transported, interrogated and held captive in what he believed was Manhattan, Gomez was transferred to a jail in New Jersey where he was detained for yet another 24 hours, the entirety of April 20th, without being allowed to see his lawyer. The agents returned to Gomez on or about April 21, ignored Gomez's request to speak to his attorney, and continued to interrogate him. The agents again threatened him with immediate deportation unless he cooperated in their investigation. If he cooperated in their investigation, the agents told Gomez, they would drop all charges against him and he would not be deported. After giving an initial statement because of the threat of deportation, Gomez again refused to join the agent's investigation of the 2003 stabbings, and stated he was never anyone of importance in the gang, had no access to information, and could not help because he would put his life in danger.

Sometime later, the agents returned with the same offer to withdraw the threat of deportation, but this time the two agents described to Gomez two different scenarios. One would be a life with dignity and happiness in the United States with his family and another, a life of terror and fear that awaited him in El Salvador. Gomez, feeling threatened, again declined but this time with great hesitation. *See* Exhibit A, Gomez Affidavit.

After repeatedly telling the agents he had no real information that could help them with their investigation on his first day of captivity, and after being detained for several days and nights, Gomez

_____

[2] The government forms entitled "Reports of Investigation" are conflicting with respect to what occurred on the 19th of April. While Gomez's limited statement concerning his immigration status is dated and signed June 19, 2005, the agents' reports of investigation in their independent criminal investigation indicate that another alleged statement was given by Gomez on the19th but the form is dated April 27 and was allegedly prepared a full week after the alleged statements were made. Other reports seem to indicate that Gomez allegedly made statements on the 20th and 21th, reports of which were filed on April 21, and 22, after the alleged April 19th statement but before it was reported. None of the forms report the agent's promises to prevent Gomez's deportation should he cooperate and assist the agents.

reiterated his fear of deportation, and gang members should he join the prosecutor's criminal investigation. The agents tried to tie Gomez to the 2003 stabbings committed by an Adrian Soriano despite the case being dismissed against Gomez by a Grand Jury. *See* Exhibit F.

On or about April 21, 2005, days after his arrest in Queens, the agents told Gomez that he could either remain happily in this country if he cooperated and help capture the assailants in the 2003 murders, or, if not, he would be deported and face a life of fear and terror in El Salvador. After shifting him from prison to prison and from State to State, without presenting him to a judge, and without allowing him to see his attorney, the agents had Gomez sign a consent form to search his home and retrieved personal effects and letters he had written to a girlfriend from his home. The agents returned to Gomez's cell, showed the items to Gomez, then told Gomez that he would not see his girlfriend or family who were present in the U.S. again should he not help the agents. After Gomez again insisted that he had TPS status and that he had work authorization, Keegan continued to threaten Gomez with immediate deportation, making reference to Gomez's misdemeanor offenses.

Sometime on April 21, 2005, days after his arrest, fearing deportation, and for his safety should he be deported, and after being held for days in different prisons and States without the help of requested counsel, a psychologically bewildered, desperate and coerced twenty-two year old Gomez then signed purported waivers of his rights to counsel and his right to remain silent and desperately made exaggerated, boastful and incriminating statements about his gang activity and admitted to participating in the fight that led to the Martinez stabbing to appease the agents and prevent his deportation.

Gomez believed that by boasting he would appear more valuable to the agents, have all charges dropped against him and prevent his deportation. After Gomez made various statements and provided the authorities with exaggerated statements about gang-related activity, the agents told Gomez that they would speak to their superiors, try and prevent his deportation, and have him released on the condition that he continue to provide information. Should he fail to cooperate, the agents stated, he would be deported.

Gomez again tried to see his counsel to give her a Notice to Appear in Immigration court, but was not allowed to see her.  On May 5, 2005, while still detained, Gomez was brought to court for his deportation hearing and, for the first time stood next to his counsel before an Immigration court judge. Immigration agents stressed to the court that TPS status was denied Gomez and that Gomez did not qualify for TPS.  Gomez's attorney stated to the Court that she wanted to ascertain whether an appeal of the denial was filed by Gomez's prior attorney.  The Immigration judge, agreeing with the agents, told Gomez that he did not believe that he would qualify for TPS, that he doubted that TPS would be granted, and that on the adjourn date Gomez would have to come up with a reason why he should not be deported. The case was adjourned until May 18. 2005.  Gomez's counsel did not tell Gomez that it was improper for the agents to coerce Gomez to relinquish his Fifth Amendment rights by threatening deportation.

On the adjourned date of May 18, 2005, because of Gomez's statements and promised continued assistance, the agents moved to administratively close the deportation case, and told Gomez that his case would be on "standby," and that should he fail to follow direction, the deportation case would be restored and he would be deported.  At the hearing, the Immigration judge firmly warned Gomez that the case was "not over" and that the case could be restored.  Immigration agents indicated to the judge that the closing of the case had nothing to do with TPS but did not elaborate as to the reasons for their closing the case. Gomez was to be in Kegan's charge during his release and would report to Kegan and agent Martinez.

In June, Gomez was again made to meet with AUSA Smith and was questioned without counsel and without being informed of his right to counsel. *See* Exhibit G (Tr.[3] Pg. 232.)  Gomez repeated statements given to Keegan and was further questioned by Smith.  Gomez's statement to Smith in June allegedly included a statement that he chased an individual with the intent to kill him, that this individual fell to the ground, and was then stabbed by Soriano ("Crazy") as Gomez acted as lookout.  The police then arrived and four gang members fled. *See* Exhibit G (Tr. Pg. 223).  This statement varied with other statements Gomez made that he saw "Crazy" getting beat up, and that those who beat him up ran when Crazy's friends approached, and that he saw them beat the guy that remained, and that he ran as he saw

---

[3] The abbreviation Tr. refers to the relevant pages of the trial transcript attached as Exhibits.

the patrol cars approach. (Exhibit H.) Gomez's statements to Smith also conflicted with the direct police observations of the stabbing. The testifying officers did not see Gomez chasing anyone, or *anyone on the ground being stabbed*. Neither officer Ostrowski nor officer Kranenberg *observed anyone on the ground*, as both of Soriano's stabbing victims remained upright as they fought and were stabbed by Soriano. The officers could not say exactly what, if anything, Gomez did as the officer observed Soriano stab a rival gang member. Officer Ostrowski testified that he observed a frenzied melee and a single brawling individual continuously confront three individuals. Two of these individuals, according to Ostrowski, pushed the individual back, and one individual, "Crazy" punched the individual in the chess area. As the officers reached the group, the individuals fled. When pressed on a gang member's specific actions, Ostrowski admitted that he could not really remember much of what occurred. (Exhibit G, Tr. Pgs., 346, 367, 379.) This lack of evidence led to the dismissal of all charges against Gomez by a Grand Jury who heard their testimony. Blood samples were present and taken from a public phone, asphalt, and a t-shirt. Beer bottles and knives were also recovered adjacent to blood samples. Biological samples were also taken from each stabbing victim for biological testing and analysis. *See* Exhibit I, Crime Scene Unit Diagram, and pages from Autopsy Reports.

After eliciting Gomez's varied statements in April, May, June and July 2005, in November 2005, Agent Keegan wrote a letter to immigration officials informing them of her view that Gomez should not get TPS or employment authorization because of his misdemeanor convictions but should remain in the country because of his valuable assistance to her criminal investigation. *See* Exhibit J. Keegan failed to indicate in her letter that Gomez had already obtained employment authorization, or that Keegan promised not to deport Gomez should he assist her criminal investigation. After the transmittal of Keegan's letter, the renewal of Gomez's work authorization was denied in November of 2005. Exhibit J.

The prosecutor procured a court-appointed attorney for Gomez in October of 2005, and pursuant to the condition of his release that Gomez continue to cooperate less he be deported, Gomez was made to sign a proffer agreement. None of the attorneys representing Gomez informed Gomez of the exact status

7

of the deportation case commenced against Gomez by agent Keegan, or that the promised relief from deportation in exchange for his statements was an improper inducement, and coercive.

Believing that he would not be deported, and that the agents would help him, Gomez began taking GED classes to qualify for his high school diploma. *See* Exhibit K. During his studies and testing, and pursuant to his coerced cooperation, Gomez was made to tape conversations between alleged gang members, attempt to recruit gang members, inform on gang-related activities, arrange gun purchases and assist in gun recoveries.

In 2006, Government officials, after telling immigration authorities that Gomez's assistance was extremely valuable and that his deportation should be deferred, expressed dissatisfaction with Gomez's assistance. Gomez was then arrested on a superseding indictment charging him with a racketeering conspiracy (18 U.S.C. §1962), use of and carrying a firearm during and in relation to a crime of violence (18 U.S.C. §924(c)), and murder in-aid-of racketeering (18 U.S.C. §1959 (a)(1). After plea negotiations broke down between the government and Gomez's court-appointed counsel, the case proceeded to trial.

None of the defense attorneys assigned to represent Gomez on the filed indictment in 2006 ever made any discovery motions with respect to the Gomez's initial arrest and interrogation, the conditions of his release from immigration custody, or the agents' threat that Gomez would be deported if he did not continue to provide them with assistance. Most significantly, the attorneys did not move to *suppress* the statements allegedly made by Gomez while he was in immigration custody, shifted from prison to prison, given misleading legal advice, and constantly threatened with deportation should he not continued to assist the agents.[4] *See Haynes* v. *Washington*, 373 U.S. 503, 513, (1963); *United States v. Williams,* 323 F.2d 65 (2nd Cir. 1963).

---

[4] Assigned counsel Susan Kellman did serve a demand for discovery dated January 27, 2007 requesting among other things, "all considerations or promises of consideration given during the course of the investigation and preparation of this matter by an law enforcement officials"... and "the substance of any oral statement which the government intends to offer in evidence at trial where made by defendant, whether before or after the indictment." Despite the request, no mention of the promised relief from deportation in exchange for Gomez's statements and cooperation was provided counsel and no motions were made by either Kellman or her successor Scott Auster for further discovery or to suppress any

Trial counsel made no suppression motions despite being aware of the continuous deportation threat, and the coercive interrogations. At trial, the alleged confession that Gomez chased a rival gang member who fell to the ground with an intent to kill him was used against him, together with uncorroborated statements concerning Gomez's possession of a firearm and the use of a firearm while Soriano stabbed Martinez.

## II. GOMEZ'S RIGHT TO TESTIFY

Gomez's trial counsel gave a sworn affirmation that Gomez told him he wanted to testify after the government rested its case, that he never alerted the Court of Gomez's decision, that he never informed Gomez that the decision to testify was his alone to make, and that Gomez was not afforded his constitutional right to testify. *See* Exhibit L.[5]   Gomez also told his appointed counsel, at the start of his trial that he wanted to present a defense and call witnesses. *See* Exhibit A, Exhibit M, (Tr. Pgs. 2-6).

## III. ADRIAN SORIANO

Gomez sought to call Adrian Soriano to testify. Soriano pleaded guilty to stabbing the rival gang member, Pedro Martinez, the basis of the murder charge in Gomez's indictment, and, although he gave conflicting statements to the prosecution, swore under oath that Gomez had nothing to do with the killing, and that he was willing to testify but was never interviewed by defense counsel. Exhibit N.   Defense counsel failed to interview not only Adrian Soriano, but any of the witnesses involved in the Martinez assault. Before its guilty verdict, the jury requested information concerning Gomez's alleged statements and testimony concerning Gomez's alleged gun possession during Soriano's stabbing of Martinez.

## IV. GOMEZ'S APPEAL

Gomez appealed his conviction asserting, among other claims, that his defense counsel was ineffective for failing to protect his right to testify and for failing to object to the exclusion of his family from the entirety of jury selection. The Court of Appeals affirmed Gomez's conviction by holding that

---

statements made after Gomez was detained and promised that he would not be deported if he cooperated with the prosecution.

[5] At the commencement of Gomez's trial, trial counsel also invited the exclusion of Gomez's family from the courtroom for the entirety of jury selection without informing Gomez of his constitutional right to a public trial. *See Presley v. Georgia,* 558 U.S. 209 (2010).

defense counsel invited the exclusion of Gomez's family from the entirety of jury selection, and that his counsel was not ineffective because Gomez did not show how the verdict would have been different had his family been allowed to watch jury selection. *See United States v. Gomez*, 705 F.3d 68 (2nd Cir. 2013).[6] As to Gomez's right to testify claim, the Court of Appeals denied his claim because information concerning his right to testify was not on the record with leave for Gomez to file the instant 28 U.S.C. § 2255 motion where he could renew his ineffective assistance of counsel claim. Gomez filed a petition for a writ of certiorari in the Supreme Court on April, 12, 2013. Gomez's petition was denied on October 7, 2013. *United States v. Gomez,* 134 S.Ct. 61 (U.S. 2013).

## ARGUMENT

### I. TIMELINESS OF CLAIMS

Defendant's Claims are Timely Under 28 U.S.C. § 2255(6) ¶ 1. Defendant's direct case became final less than one year before the filing of this motion, and therefore, his 2255 claims are timely under 2255 (6) ¶ 1.

### II. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO CONDUCT DISCOVERY AS TO GOMEZ'S STATEMENTS AND FOR FAILING TO MOVE TO SUPPRESS HIS ALLEGED CONFESSIONS.

When considering the admissibility of a defendant's statements, the "true test of admissibility is that the confession is made freely, voluntarily and without compulsion or *inducement of any sort*" *See Haynes* v. *Washington*, 373 U.S. 503, 513 (1963) quoting *Wilson* v. *United States*, 162 U.S. 613, 623 (1896)(*emphasis added*); see also *Lyons* v. *Oklahoma*, 322 U.S. 596, 602 (1944); *Ziang Sung Wan* v. *United States*, 266 U.S. 1, 15 (1924); *Bram* v. *United States*, 168 U.S. 532, 545 (1897).

A statement obtained by the government by inducing fear through official threats of deportation is not a statement voluntarily given. *See Bong Youn Choy v. Barber,* 279 F.2d 642, 647 (9th Cir. 1960); A confession is likewise involuntary when an alien is misinformed about his rights, his attempts to contact

---

[6] Gomez also asserted on appeal the breach of a proffer agreement by the prosecution when the prosecution used Gomez statements about a co-defendant's possession of a gun to establish the charge that Gomez unlawfully used a firearm in the furtherance of the stabbing of Martinez despite there being no evidence that a gun was ever used in the stabbing committed by Soriano and charged against Gomez.

his lawyer are interfered with, and he spends a substantial time in custody. *In re Garcia*, 17 I. & N. Dec. 319, 320 (BIA 1980).   Moreover, threats of deportation designed to extract a confession to a crime are coercive when a defendant is repeatedly cajoled and ultimately threatened with deportation should he not confess. *See Martin v. United States*, 166 F.2d 76, 79 (4th Cir. 1948).

Defense counsel was ineffective for failing to investigate the circumstances surrounding the statements allegedly made by Gomez to Agent Keegan and AUSA Smith while being threatened with deportation, and in failing to move to suppress the statements.   Gomez was detained, cajoled, and threatened with immediate deportation should he not assist the agents' gang investigation and then cooperate with their investigation.   His alleged statements, extracted through improper threats, inducements, and denial of counsel, were involuntary. *See Haynes* v. *Washington*, 373 U.S. 503, 513 (1963).   Trial counsel's failure to suppress the statements was ineffective assistance of counsel.   *See Kimmelman v. Morrison*, 477 U.S. 365 (1986).

There is a reasonable probability that the verdict would have been different absent the excludable statements made to agent Keegan and prosecutor Smith concerning Gomez's intent on the night of the murder charged.   Gomez's alleged statements were the only evidence of Gomez's intent while in the midst of an alcohol-fueled melee resulting in Adrian Soriano's stabbing of two rival gang members.   As the conviction relied principally on the coerced statements to establish Gomez's intent and culpability, the evidence to convict was insufficient absent the tainted confessions.   Competent counsel, in light of long-established case law, would have made the motion to suppress the statements.

Trial counsel must have known that statements obtained by inducing fear through official threats of deportation are involuntarily given.   Keegan's threat of deportation, her continuing promise to Gomez of relief from deportation, and her interference with Gomez's access to counsel, together with AUSA Smith's failure to advise Gomez of his right to counsel were designed to extract from Gomez a confession to a crime. *See Choy v. Barber* 279 F.2d 642, 647 (9th Cir. 1960); *see also Cannan v. United States*, 19 F.2d 823, 824 (5th Cir. 1927); *Symons v. United States*, 178 F.2d 615, 619-620 (9th Cir. 1949); *Martin v. United States*, 166 F.2d 76, 79 (4th Cir. 1948).

11

In *Mohamed Raja v. Mu,* 544 F.3d 427, 445 (2nd Cir. 2008), the Second Circuit stated explicitly that Title 8 C.F.R. § 287.8(c)(2)(vii) provides that "[t]he use of threats, coercion, or physical abuse by the designated immigration officer to induce a suspect to waive his or her rights or to make a statement is prohibited."   The Court in *Mohamed* explained that an alien's statements are involuntary when he is threatened with deportation, misinformed about his rights, his attempts to contact his lawyer are interfered with, and he spends a substantial time in custody. *See Mohamed Raja v. Mu,* 544 F.3d 427, 445 (2nd Cir. 2008) citing *Bong Youn Choy v. Barber,* 279 F.2d 642, 647 (9th Cir. 1960).

Although the Second Circuit found, under the facts of *Mohamed,* that documents produced or statements made pursuant to regulatory scheme did not violate defendants' constitutional rights, and did not violate a fifth amendment privilege, it stated explicitly *"the foregoing discussion has no relevance to government inquiries that are focused on independent crimes only tangentially related to an alien's immigration status- for example, questions about drug sales that might, if a conviction followed, constitute an aggravated felony requiring an alien's deportation. See 8 U.S.C. § 1227(a)(2)(A)(iii) (requiring deportation of aliens who commit aggravated felonies)." See Mohamed Raja v. Mu,* 544 F.3d 427, 443 (2nd Cir. 2008)(*emphasis* added).

In this case, Keegan's and Smith's questions concerning their gang investigation and Gomez's knowledge about gang activity-including drug sales, arms possession, and stabbings all posed during Gomez's prolonged detention and deportation proceedings could and did result in statements which led to Gomez's conviction for aggravated felonies, and, most importantly, were unrelated to Gomez's immigration status or to his possible deportation because of misdemeanor convictions.

In contrast, in *Mohammed* the Second Circuit found that the questions posed were on the petitioner's interview dates and pursuant to an authorized registration program.   Moreover, as Gomez was never informed that pleading guilty to misdemeanors could result in his deportation, or that he could challenge these guilty pleas as a basis of his deportation, Keegan's threats of immediate deportation solely

12

because of these misdemeanors to elicit Gomez's waiver of rights and statements, misinformed Gomez about his legal rights. *See Padilla v. Kentucky*, 130 S.Ct. 1473 (2010).

Gomez had a right to counsel which was violated, and was coerced into signing waiver documents and making statements implicating him in the crimes of murder and attempted murder. *See INS v. Lopez-Mendoza*, 468 U.S. 1032 at 1051 n.5 citing *Matter of Garcia* 17 I. & N. Dec. 319, 320 (BIA 1980) in which the BIA invoked the "requirements of due process" to suppress the respondent's involuntary admissions after his repeated requests for counsel were denied.

That the agents succeeded in inducing Gomez to make further incriminating statements during his assistance, does not cleanse the statements or Gomez's "cooperation" of the taint of the government's coercion. *Tague v. Louisiana*, 444 U.S. 469 (1980). Indeed, Gomez was never free *not* to cooperate as he was told that if he did not continue assisting the prosecution he would be deported and the impetus of his cooperation remained with the agents and prosecuting authorities. In fact, Gomez's deportation case remained, according to the agents and Immigration judge, on "standby" and subject to restoration. Gomez was repeatedly warned that if he ceased helping the agents he would be deported, and was told by the Immigration Judge, before he was released, that the case "was not over." Significantly, prior to the June meeting with AUSA Smith, Gomez was not informed by Smith that he had a right to counsel before making the statement concerning his intent on the night of the stabbing. *See* Exhibit G (Tr. Pg. 232); *see also Miranda v. Arizona*, 384 U.S. 436 (1966).

Counsel failure to make the discovery and suppression motion was ineffective assistance of counsel as the Supreme Court and Second Circuit have long recognized improper inducement and threats as conduct which render statements involuntary. See, *e.g., Haynes* v. *Washington*, 373 U.S. 503, 513 (1963); *Wilson v. United States*, 162 U.S. 613, 623, (1896); *Lyons v. Oklahoma*, 322 U.S. 596, 602, (1944); *Ziang Sung Wan v. United States*, 266 U.S. 1, 15 (1924); *Bram v. United States*, 168 U.S. 532, 545 (1897).

13

In the instant case, the improper conduct of the Immigration agents, conduct contrary to their own regulations and procedures, induced the admissions made by Gomez during his prolonged captivity and deportation proceedings. *See Lyons v. State of Oklahoma*, 322 U.S. 596, 603, 604 (1944); *Leyra v. Denno*, 347 U.S. 556, 561 (1954). Consequently, the inclusion into evidence of Gomez's April and June statements transgressed due process of law. As the evidence against Gomez was insufficient (*see* Infra point II), any conviction on the basis of these statements should be vacated. Absent the coerced confessions, the evidence did not support the inference that Gomez, during an alcohol-fueled melee of six to seven individuals, formulated the specific intent to murder Pedro Martinez, or intentionally aided Adriano Soriano, stab Martinez.

Moreover, there was simply no evidence showing that Gomez possessed a gun in furtherance of the violence charged when another individual, whose testimony exculpates Gomez, was responsible for the *stabbing* death of the rival gang member. *See Rosemand v. United States*, 572 U.S. ____ (2014). As there was no evidence of Gomez's culpable conduct and intent as to stabbing of Martinez, Defense counsel's failure to move for suppression fell below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668 at 692 (1984); *Saltys v. Adams*, 465 F.2d 1023 (2nd Cir 1973).

III. **DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING TO PROPERLY INFORM GOMEZ OF HIS RIGHT TO TESTIFY AND IN FAILING TO EFFECTUATE GOMEZ'S DECISION TO TESTIFY**

Gomez told his trial counsel repeatedly and unequivocally that he wanted to testify both before and immediately after the Government rested its case. Trial Counsel did not alert the Court of Gomez's expressed desire to testify or inform Gomez that the decision to testify was Gomez's decision to make. Trial counsel admits in his affirmation that after Gomez told him he wanted to testify, and that Gomez was not afforded his constitutional right to testify. *See* Exhibit L.

Not knowing that the decision to testify was his decision to make, and not knowing that he could interrupt the proceedings and demand to speak, Gomez was deprived of his constitutional right to testify. *See Rock v. Arkansas,* 483 U.S. 44 (1987). Significantly, Gomez was directed at the trial's inception that he should speak through counsel when he politely raised his hand in an attempt to address the Court about

14

his defense. *See* Exhibit M (Tr. Pg. 2.)  Gomez was not informed by his counsel, after Gomez stated to him that he wanted to testify, that he could interrupt the proceedings and demand to exercise a decision he did not know was his to make. *See Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001).  Gomez, thus, *did not* and *could not knowingly and voluntarily* waive his right to testify. *See Johnson v. Zerbst,* 304 U.S. 458 (1938).

Defense counsel's silence at the close of the government's case could not waive Gomez's personal and basic right to testify. *See Johnson v. Zerbst,* 304 U.S 458 (1938); *Jones v. Barnes,* 463 U.S. 745 (1983); *see also New York v. Hill,* 528 U.S. 110, 115 (2000) (there are basic rights that an attorney cannot waive without the fully informed and publicly acknowledged consent of the client).  As Gomez desired to testify and as trial counsel could not waive his right to do so, Gomez's right to testify was violated when counsel failed to effectuate Gomez's decision to address the jury. *See Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001).

A defendant's constitutional right to testify is fundamental and personal and only the defendant may waive it.  *See United States v. Teague*, 908 F.2d 752, 759-60 (11 Cir. 1990). "[T]he absence of an on the record objection by defendant himself is of little, if any, probative value in determining whether the decision that the defendant would not testify was the defendant's own decision." *Id*. at 759; *see also Unites States v. Vargas,* 920 F.2d 167, 170 (2d. Cir. 1990) ("We regard as highly questionable the proposition that a defendant's failure to object at trial to counsel's refusal to allow him to take the stand constitutes a waiver of the defendant's constitutional right to testify on his own behalf"). In *Teague*, the Eleventh Circuit noted that a defendant at trial "is told that all further communications with the court and the prosecutor should be made through his attorney," *United States v. Teague*, 908 F.2d 752, 759 (11th Cir. 1990).  The *Teague* court also observed that defendants who speak out of turn are faced with swift reprimand from the trial court and face possible discipline. *Id*. At 759.

The violation here is akin to structural error as, in many ways, the force of Gomez's ungiven testimony is immeasurable.  The question of prejudice goes beyond the *substance* of Gomez testimony, it is a matter of Gomez's desire to speak directly to those judging him, and to, by necessity, express any

15

emotion that testifying arouses, like a tremble in the voice of one falsely accused. Yet, whether classified as structural or trial error, Gomez was actually prejudiced because counsel's performance deprived Gomez of the opportunity to give his version of events, and, most importantly, to address his alleged confessions in the face of the sparse and inconsistent evidence of his intent and culpable conduct on the night of the stabbings.

The voluntariness, authenticity, veracity and reliability of a confession is a question of fact for the jury and Gomez had a constitutional right to establish the "physical and psychological environment that yielded the confession (because this) can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence .... Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, *and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.*" *See Crane v. Kentucky*, 476 U.S. 683, 686, 689 (1986) (*emphasis added*).

Had Gomez not been denied his right to testify the twenty-two year old Gomez would have explained how he was tormented psychologically because of the agent's threats and improper inducements. Gomez would have explained that the threats continued even after he began assisting the prosecutors, and that he was told that the deportation case was "not over" and always on "standby." A reasonable jury would have concluded that the desperate Gomez, after being cajoled by the agents and hearing from the Immigration Judge, made the incriminating statements to prevent his deportation and appease the agents. A reasonable jury would have also discounted the varied and inconsistent confessions concerning Gomez conduct and intent in relation to the Martinez stabbing. It is more than reasonably probable then that the petit jury, akin to the Grand Jury before it, would find that the charges against Gomez were not proven beyond a reasonable doubt. *See* Exhibit F.

Gomez would have testified that he never intended to kill anyone, and, as the gang members brawled, ran when he heard the police approaching. He would have testified that he did not aid or assist anyone kill Pedro Martinez and that he made false and exaggerated statements to appease the agents and because

he did not want to be deported. Gomez, would have testified the he never told "Payaso" to bring a gun to a "hooky party" as testified to by the cooperating witness Vindell Betanco. Indeed, the boastful Vindell Betanco testified that he told "Payaso" to bring a gun to the party and bragged about threatening a rival with it. *See* Exhibit O. Gomez would have testified that he told the agents about the gun and helped the agents recover it. Payaso's gun had nothing to do with the attempted murder and murder charged against Gomez, yet the prosecution charged that Gomez used the gun in furtherance of the murder and attempted murder. Significantly, the jury requested information concerning the "Payaso" firearm, and Gomez's statements, during its deliberations. *See* Exhibit P, (Tr. Pgs. 781, 783).

The record makes clear, Gomez did not possess a gun in furtherance of the violence charged in indictment. His testimony would have created the reasonable probability that the verdict would have been an acquittal on the murder and gun charges and would have necessitated a directed verdict on the gun charge. *See Rosemand v. United States*, 572 U.S. _____ (2014). There was simply no evidence showing that Gomez possessed a gun in furtherance of the murder charged as Adrian Soriano, whose testimony exculpates Gomez, was responsible for a *stabbing* death of a rival gang member. There was simply no evidence of any gun possessed by any individual during the gang melee.

In *Crane v. Kentucky*, 476 US 683 (1986), the Supreme Court held that a defendant's testimony of his confessions can be of "substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be "insufficiently corroborated or otherwise . . . unworthy of belief." *See Crane v. Kentucky*, 476 US 683. citing *Lego* v. *Twomey*, 404 U.S. 477 at 485-486 (1972). The *Crane* Court explained that "stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt? Accordingly... a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility." *Crane v. Kentucky*, 476 U.S. 683 (1986).

17

Gomez should have been allowed to address the jury, as the evidence against Gomez at trial was not "overwhelming." The government's civilian and cooperating witnesses were unreliable and their testimony equivocal concerning Gomez's involvement in the violence charged. The witness Serrano did not see anyone holding a knife during the incident which resulted in the charge of attempted murder but observed the cooperating witness, Portillo, kicking someone on the ground. Serrano could not remember whether Gomez was involved in the altercation but clearly remembered others assaulting he victim. (Exhibit M, Tr. Pgs. 158, 166.) Orellena, likewise could not remember whether Gomez was involved in the altercation but remembered her husband, Portillo, kicking someone on the night of the attempted murder (Exhibit M, Tr. Pg. 194.)

With respect to the murder charged against Gomez, Gomez's accounts concerning his alleged role in the 2003 death were inconsistent, varied and not credible. Indeed, while the government maintained that Gomez stated he acted as a lookout for "Crazy" while "Crazy" stabbed a rival gang member, *who was on the ground*, and was "looking back and forth" for the police (Exhibit G, Tr. Pg. 223), neither Ostrowski nor observing officer Kranenberg *observed anyone on the ground*, as both of Soriano's victims remained upright (Exhibit G, Tr. Pgs. 346; 379). Responding Officer Ostrowski testified that he observed a frenzied melee and a single brawling individual continuously confront three individuals. Two of these individuals, according to Ostrowski, pushed the individual back, and one individual, "Crazy" punched the individual in the chess area. When the office arrived, the individuals ran. When pressed on a gang members' *specific actions*, officer Ostrowski admitted that he could not really remember much of what occurred. *See* Exhibit G, Tr. Pg. 367. In the face of this ambiguity, a reasonable New York State Grand Jury, consisting of from 16 to 23 jurors dismissed all of the murder charges against Gomez in 2003 after hearing directly from the observing officers about Gomez's alleged conduct during the stabbing. *See* Exhibit F. Their observations were not consistent with Gomez's exaggerated statements of his involvement in the stabbing including his statement, made under the threat of deportation, that he chased an individual, *who fell down*, with the intent to kill him. Indeed, apart from the falsity of Gomez's confession, there is no evidence of who Gomez allegedly referred to when he allegedly stated that he

18

chased a gang member with the intent to kill him.   Soriano stabbed two individuals on the night in question, Pedro Martinez and Eduardo Leason, (Exhibit Q) there was never any evidence adduced by the prosecution as to who Gomez allegedly chased with the intent to kill.   Police reports indicate both stabbings occurred on the corner of 149th and Jamaica Avenue.

The ambiguity in the prosecutor's case, and in the alleged confession, made Gomez's testimony and clarification essential to his defense.   The record shows that the twenty year old Gomez exaggerated and boasted to agent Keegan and AUSA Smith, and that most of what he said to the agents could not be confirmed, and in all likelihood, never occurred (Exhibit R, Tr. Pgs. 582, 583.)[7]

Had Gomez testified about these events and about his dubious statements, he would have directly anticipated and responded to the jury's questions about these questionable statements during its deliberations (Exhibit P, Tr. Pgs. 782-789.)   The twenty-two year old Gomez was entitled to explain his actions in the face of the ambiguity in the government's case, and the lack of clarity in the officers' testimony.   All of Gomez's statements, including his statements made after his arrest in 2003, varied with his statements after he was threatened with deportation.   It is reasonable to believe that Gomez's testimony including testimony about his deportation proceedings would have led the jury to discount his confession as unreliable as they did not match the officer's observations.   It is also reasonable to believe that, absent reliance on these confessions, the trial's outcome would have differed.

Despite knowing all of this, and despite being privy to Gomez's desire to testify, defense counsel failed to call Gomez, failed to properly advise him of his right to testify, and failed to call his witnesses. Yet in summation, defense counsel hinted to the jury what the defense case would have been when he told the jury that Gomez simply boasted to the agents and exaggerated about his involvement in the violence charged,

---

[7] A database of wrongful convictions created by the University of Michigan and Northwestern law schools known as the National Registry of Exonerations highlights 180 exoneration cases where the convicted individual falsely confessed. The young and cognitively impaired are even more susceptible to false confession during police interrogations.

....He told them about robberies that they could not corroborate. He told them about stabbings that they could not confirm. He told them about other criminal activity none of which the government was able to confirm...

(Exhibit R, Tr. Pg. 691).

That's the mindset that Mr. Gomez has, if he makes himself more valuable to the Government, he becomes – enhances his position with them. None of the incident could be corroborated because they didn't happen.

(Exhibit R, Tr. Pg. 692.).

After impermissibly waiving Gomez's personal right to testify and put on a defense, including an affirmative defense, trial counsel argued Gomez acted in self-defense against the violent Neta gang members, when he threw beer bottles at them,

Trouble came to them in the form of the other gang members that were there that confronted them. There is no testimony from anyone that Gomez did anything other than throw a bottle and throw a can, and I submit to you he did that in self-defense.

(Exhibit R, Tr. Pg. 687.)

In his rebuttal argument, the prosecutor quite properly noted to the jury that what the defense and prosecution say *"isn't evidence"* but that "what you heard from the witness stand," is evidence. (Exhibit R, Tr. Pg. 695.)   The prosecution simply reminded the jury that the defense had presented no evidence to support its theory.

On this record, prejudice could not be more amply demonstrated. At the actual trial, defense counsel argued a theory which was not factually supported.  In the plainest terms, the prosecutor told the jury that the defense theory had no factual basis. However, at the trial which would have occurred but for counsel's ineffective assistance, the defense theory would have been powerfully and factually supported by Gomez.  If the jury discounted the confessions as unreliable, not believing Gomez's dubious admissions, the remaining evidence did not support the inference that Gomez, during an alcohol-fueled melee of six to seven individuals, formulated the specific intent to murder Martinez.

Gomez had a constitutional right to explain his version of the facts, *Owens v. United States*, 483 F.3d 48, 59 (1st Cir. 2007), and to explain to the jury the circumstances surrounding his alleged confessions. *See Crane v. Kentucky*, 476 U.S. 683 (1986). His testimony as to non-involvement in the

20

murder charged cannot be disregarded. Gomez respectfully submits that if he had testified at trial, there is a reasonable probability that the result of his trial would have differed.

**IV.   DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO INTERVIEW THE WITNESS SORIANO AND CALL HIM TO TESTIFY FOR GOMEZ AND FOR FAILING TO INTERVIEW ANY OF THE WITNESSES TO THE MARTINEZ STABBING.**

Gomez was charged with the murder of Pedro Martinez during a gang street fight. Pedro Martinez died after being stabbed by Adrian Soriano who desired to testify at Gomez's trial that Gomez had nothing to do with the killing. *See* Exhibit N (Affidavit of Adriano Serrano). Despite being made aware of Adriano Serrano and his role in the murder as well as desire to testify for Gomez, defense counsel failed to interview Soriano or call him to testify on Gomez's behalf.

Defense counsel's failure to interview the available and willing witness Soriano knowing that he was directly responsible for the killing that Gomez was accused of amounts to constitutionally deficient performance of counsel. *See Rompilla v. Beard,* 545 U.S. 3749 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003). Soriano could testify about his battle with Pedro Martinez and whether he was aided by Gomez when he stabbed Martinez. Soriano would have testified that Gomez did nothing to assist him, consistent with the officers' observation in 2003 and the Grand Jury dismissal after hearing from the officers who observed the fight. He would have also testified that no one possessed a gun on the night of the stabbing.

Soriano the actual assailant of Pedro Martinez, could have responded to the jury's questions concerning the exact actions of Gomez on the night in question. The failure to interview and call Serrano by defense counsel was ineffective assistance of counsel *See Pavel v. Hollin*s, 261 F. 3d 210 (2nd Cir. 2001); *Lindstadt v Keane*, 239 F.3d 191 (2nd Cir. 2001); *Eze v. Senkowski*, 321 F.3d 128 (2nd Cir. 2003). Soriano states in his affidavit that Gomez had nothing to do with the killing, and that he was willing to testify on Gomez's behalf. Soriano would have also testified that he stabbed the brawling rival gang member and that Gomez never possessed a gun or knife in furtherance of the violence committed. Soriano's sworn testimony exculpates Gomez. This testimony would have altered the jury's verdict not only as to the murder charge against Gomez but also as to the charge of possessing of firearm during and

21

in relation to a crime of violence (18 U.S.C. 924(c)). *See Rosemand v. United States*, 572 U.S. ____(2014). The testimony would have also necessitated the jury's acquittal of Gomez on the Murder charge and the firearm charge as there was no evidence that Gomez actively employed a gun in connection with the murder as charged in the indictment. The Government's theory was that Gomez used the gun to commit the murder and attempted murder, but produced no evidence to support its theory. Had defense counsel interviewed Soriano, and had he testified, the jury would have heard from the killer of Martinez how he, unaided by Gomez, stabbed the rival gang member. Because his testimony would have exculpated Gomez completely, Gomez suffered actual prejudice because of defense counsel's deficient performance and there is a reasonable probability that the verdict would have been different but for counsel's performance.

## V. GOMEZ IS ACTUALLY INNOCENT OF THE CRIMES CHARGED AGAINST HIM IN THE INDICTMENT.

The theory of the government's case was that Gomez was guilty of a murder when he used a firearm in furtherance of the Martinez stabbing. Because Gomez did not intend to kill Martinez, and because neither Soriano nor anyone else involved carried a gun when Soriano suddenly stabbed Martinez, Gomez is actually innocent of the crimes charged. *See Rosemand v. United States*, 572 U.S. ____ (2014).

Gomez did not aid and abet Soriano with the intent of facilitating the stabbing of Martinez, nor did Gomez carry a gun in furtherance of the stabbing of Martinez. Clearly, Gomez is innocent of the 924 (c) crime, and the Soriano affidavit together with Gomez's explanation of his false confession, and the varying accounts of his conduct both by Gomez and the officers who observed Soriano stab Martinez establishes his actual innocence. The conduct requirement of intentionally aiding and abetting the stabbing death of Martinez was simply not satisfied. There is no evidence that Gomez, charged with using a gun to kill Martinez, knew Soriano had a gun or a knife when Soriano suddenly stabbed Martinez, and there is no evidence that Gomez intended to kill Martinez or anyone else stabbed by Soriano. Indeed, apart from the unreliability and falsity of his alleged confession, there is no evidence of who Gomez allegedly referred to when he allegedly stated that he chased a gang member *who fell to the ground* with

the intent to kill him.  Soriano stabbed two individuals on the night in question, Pedro Martinez and

Eduardo Leason, (Exhibit Q) and there were many gang members present.  None of the officers observed

Martinez fall to the ground, in fact, Officer Kranenberg testified that he observed someone (presumably

Martinez) standing and pausing during the fight to point out Soriano before Soriano fled (Exhibit G, Tr.

Pg. 379).  Police reports indicate both stabbings occurred on the corner of 149th and Jamaica Avenue.  As

no gun was used by Gomez in furtherance of a stabbing, and as there is no evidence that Gomez intended

to kill Martinez because his alleged confession is false, unreliable, and uncorroborated, and, in any event,

does not specify Martinez as the object of his alleged intent, Gomez is actually innocent of the murder

charged in the indictment.

## VI. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO FILE DISCOVERY MOTIONS WITH RESPECT TO GOMEZ'S CIVIL DEPORTATION HEARING AND THE GOVERNMENT VIOLATED ITS DISCOVERY OBLIGATIONS WITH RESPECT TO THOSE HEARINGS UNDER FRCP RULE 16.

Gomez was produced in Immigration court by ICE agent Keegan on or about May 5, and 18,

2005 for his deportation.  Defense counsel was ineffective for failing to demand any and all records

pertaining to Keegan's processing of Gomez's deportation case before the Immigration judge, and any

and all statements or arrangements with said court for the release of Gomez as he cooperated with

Keegan's investigation. These deportation hearings were held before Gomez's alleged statement to

AUSA Smith that he intended to kill a person who fell to the ground.  The agents at the hearing

threatened deportation and summarily opposed Gomez's TPS argument.  These hearings are routinely

taped and all statements made by agents, the judge, as well as Gomez concerning his deportation, TPS

status, notice to appear, and conditional release from immigration custody are recorded. The withholding

of this tape violated FRCP Rule 16. *See United States v. Thomas*, 239 F.3d 163, 168 (2d Cir. 2001).  Title

18 U.S.C. 3500 also requires the government to disclose a government witness's prior statements that are

in the government's possession and relate to the subject matter of the witness's direct testimony. *See also*

Fed R. Crim. P. 26.2.

Defense counsel knew of Gomez's deportation proceeding and knew of the government's arrangement to have the deportation case placed on "standby" so that Gomez continued cooperating. Yet defense counsel made no motion for all documents, data and statements made with respect to Gomez's deportation hearings and his release from immigration custody. The tape must contain information relevant to Keegan's arrest of Gomez, her threats of deportation to gain his cooperation, and to the interference with Gomez's right to counsel. The agent's position on Gomez's TPS application, the judge's response to any such arguments, and the fact that the case could always be restored was also relevant to the coercion placed on Gomez to continue to cooperate less he be deported. Defense counsel's failure to demand the production of this data was ineffective assistance of counsel (*See United States v. Birnbaum*, 337 F.2d 490, 497 (2d Cir. 1994)) and the Government's failure to produce the tape and data, as it were requested by counsel Kellman, was a violation of the Federal Rules of Criminal Procedure.

## VII.  DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO CONFRONT THE WITNESSES AGAINST GOMEZ.

Defense counsel's complete failure to cross examine the witnesses against Gomez prevented Gomez from mounting a defense and stemmed from a misunderstanding of the law. Counsel was ineffective in failing to comprehend that Gomez's alleged proffer agreement did not prevent him from cross examining the witnesses against him. *See United States v. Oluiswualo*, 605 F.3d 124 (2nd Cir. 2005); *see also United States Barrow*, 400 F.3d 109 (2d Cir. 2005). The proffer agreement simply allowed the prosecution to introduce Gomez's statements given during a proffer should his trial assertions be contrary to these statements. This did not mean that defense counsel could not question a witness's credibility or ability to observe during the alleged murder and attempted murder. *See United States v. Barrow*, 400 F.3d 109 (2d. Cir. 2005). That the prosecution threatened to use Gomez's proffer statements against him, does not excuse defense counsel's abdication of his responsibility to confront the witnesses against Gomez. Counsel's performance fell below an objective standard of reasonableness.

24

## VIII. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO DEMAND THAT BLOOD OR BIOLOGICAL EVIDENCE RECOVERED FROM THE CRIME SCENE AND STABBING VICTIMS BE PRODUCED AND ANALYZED, AND GOMEZ MOVES FOR SUCH ANALYSIS

Defense counsel, aware that blood samples were taken from the crime scene, and were in the government's possession, was ineffective for failing to move that these samples be produced and analyzed for the presence of Gomez's DNA on any samples recovered. Such an analysis would have shown that blood and DNA of multiple individuals other than Gomez were recovered in connection to the Martinez assault and would have been presented to the jury as evidence of Gomez's actual innocence of the Martinez stabbing. Gomez thus moves this Court pursuant to 18 U.S.C. § 3600(g) to consider any DNA test results from the recovery of any blood or tissue samples and order a new trial. Alternatively, if the Court denies Defendant's motion for a new trial without additional DNA testing, Defendant moves this Court pursuant to 18 U.S.C. §3600(a) for an order authorizing him to inspect all physical evidence in the government's custody for the presence of biological evidence, and to subject all biological evidence selected by the defendant to additional DNA testing. *See* Exhibit I.

### CONCLUSION

For the reasons stated above, defendant respectfully requests that this Court vacate his conviction, sentence and fines on all three criminal counts in the superseding indictment, reset the case on the court's trial calendar, or in the alternative, set the petition for an evidentiary hearing upon due notice, and, pursuant to the Innocence Protection Act of 2004, § 18 U.S.C. 3600 (b)(3), compel the government to produce, for inspection and/or analysis, the blood samples recovered from the crime scene.

Respectfully submitted,

Edward Irizarry
Attorney At Law