# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

V.                                                    CASE No.  06-613 (S-2)(SJ)

AMILCAR GOMEZ

AFFIDAVIT

I, AMILCAR GOMEZ, being duly sworn depose and say that:

1. I respectfully submit this affidavit in support of my motion pursuant to 28 U.S.C.
   § 2255 to vacate, set aside or correct the judgment and sentence entered against
   me in *United States v. Gomez*, Criminal No. 06-613 (S-2)(SJ).

2. I apologize for taking up this Court's valuable time, but I repeatedly told my
   lawyer that I wanted to testify at my trial and this petition would not have been
   necessary if he allowed me to testify.  I told him at the start of my trial that I
   wanted to testify and had witnesses that wanted to testify on my behalf.  I raised
   my hand in Court to explain this to the Court but my lawyer told me to put my
   hand down, that I should only speak through him, and that I should relate what I
   wanted to say to him.

3. I believed him and put my hand down and explained to my lawyer that I wanted
   to present a defense and needed time to get my witnesses. My lawyer then spoke
   openly to the Judge and Court, leading me to believe that only he could speak for
   me in Court.  After listening to my lawyer, the Court denied my request for more
   time to get my witnesses. This is on pages 2 and 3 of the trial transcript which I
   attach to this motion. My lawyer also did not tell me that I had the constitutional
   right to have my family present during jury selection before he asked them to leave
   for the entirety of jury selection. This is also on pages 2 and 3 of the
   transcript.

4. Towards the end of the case, I again told my lawyer that I wanted to testify, but
   my lawyer never told the Court that I wanted to testify and I believed that this was

Pg 1 of 8 A6

his decision to make and that only he could speak for me in Court as he did in the beginning of the case. After the trial, when I got a new lawyer, the trial attorney gave us a sworn affirmation that I told him that I wanted to testify, that he never rested my case, and that I was denied my constitutional right to testify. This affirmation is also attached to this motion. I was never allowed by my trial attorney to explain to the jury the circumstances surrounding my alleged statements and confessions to the prosecutor, or my version of events.

5. Because I was denied my right to testify and because my trial counsel was ineffective in defending me, I now respectfully further state, under oath, the following:

6. In October of 2002, I hired a lawyer to represent me and prevent my deportation to El Salvador by obtaining Temporary Protected Status (TPS) and employment authorization. I feared for my life in El Salvador because of the constant violence, corruption and inability of the police to protect the people. I was afraid of being sent back and wanted to establish a life in this country.

7. I was in U.S. without documentation because I came here uninspected and my lawyer, after submitting my application, told me that my TPS status was granted as well as my employment authorization. I was overjoyed and determined to begin a new life here. My lawyer also told me that they would handle all the renewal forms for my TPS status and employment authorization. These forms I also attach to this motion.

8. After I submitted the TPS application, received work authorization, and applied for renewals, I began working and supporting myself and my mother who cleans houses. On April 15, 2005, after leaving for work in the morning, I was called on my cell phone and told to return home by my mother because probation officers were at my home. As I was on probation for a misdemeanor office at the time, I went back home believing the probation officer wanted to speak to me and as I was always in compliance with probation.

9. When I returned home I met Ms, Erin Keegan and Celestino Martinez who had entered my home and told my mother that they were probation officers and that I would have to return home to meet with them. When I returned home, I was arrested by the agents who immediately threatened to deport me for entering the country illegally and for committing two misdemeanors. These convictions, Keegan told me meant that I would be deported immediately. I did not understand and told the agents that I wanted to speak with my lawyer. No one including my lawyer ever told me that if I pled guilty to misdemeanors I would be deported.

10. Because of my misdemeanor convictions, the agents stated, an order of deportation was issued and I was to be deported. Keegan, even though I told her I did not want to speak without my attorney being present, asked me about gang-

activity in Queens that she was investigating. Again, I told her I did not want to speak to her as they drove me away from my home into Manhattan.

11. I was arrested and threatened with deportation even though I asked to speak with my attorney. I told Keegan that I did not want to be deported and that is why I had a lawyer and was afraid of going back to El Salvador. I told her I had TPS status and work authorization. This, I said could be proven by my documents. I repeated my request to speak to my attorney, refused to speak to Keegan about any alleged gang-activity without my lawyer and requested access to a phone so that I could call my lawyer.

12. Keegan ignored me and told me that because of my convictions I was going to be deported. I told the agents, including Agent Keegan who spoke limited Spanish, of my wish to speak to my lawyer, and refused to speak to them about gang activity in Queens.

13. I was held captive for several days without being able to call my lawyer and threatened with deportation unless I helped the agents in their investigation. I was held and transferred from Queens, to Manhattan and then to New Jersey. I did not know precisely where they took me all of those times, they did not tell me. But they kept threatening me with deportation and promising me that I would not be deported if I helped them. The agents returned sometime on the 19th of April.

14. On the 19th, I was desperate and confused after being held without communication with my lawyer, signed some documents and stated my name, date of birth, details about my coming into the U.S., and that I applied for TPS status and was in fear of returning to El Salvador. I refused to make any further affirmative statements, without my lawyer present, by drawing a diagonal line from the blank bottom portion of the statement page to the end of the last sentence of the statement, and continued to ask to see my attorney. I signed along the diagonal line.

15. Despite my request for counsel and my limited statement, the agents continued to threaten me with deportation and ask me questions about gangs and murders and asked me if I was a member of the MS13 because my prior misdemeanor arrests involved MS13 gang members. Exasperated, confused, pressured and afraid of deportation, I signed documents presented to me by the agents, and told them that I was involved in the gang but that was a long time ago and that I was not involved anymore because I sought employment and strived to better myself. I was involved in a gang because the individuals shared my culture and I longed for companionship in a foreign country.

16. When the agents asked me about a murder committed in 2003 that I was charged with in Queens, before the case was completely dismissed in state court, I told them that I remembered very little of the night in question because I was drunk and could hardly walk.

17. When the agents asked me to help them apprehend the assailants, I refused because I could remember very little of the night in question. As they questioned me, I was always afraid that they would immediately deport me if I said something they did not like, so that is why I asked for my lawyer. I felt pressured to help them and speak to them because of their threats of deportation. They seemed to know this so they promised me that if I helped them and joined their investigation, they would not deport me.

18. After the agents finished interrogating me on the 19th of April, I was transferred to a jail in New Jersey where I was detained for another 24 hours, the entirety of April 20th, while still under the threat of deportation without communication with my lawyers despite my requests to call them. I became very frightened believing they would send me back to El Salvador where I would be killed. I believed that the agents care little of what would become of me in El Salvador.

19. The agents returned on or about April 21, and continued to ignore my requests for my lawyer, continued to interrogate me and threaten me with immediate deportation because of his misdemeanor convictions unless I cooperated in their criminal investigation.

20. If I cooperated in their criminal investigation, the agents stated, they would drop all charges against me and I would not be deported. After being compelled to give a statement because of the threat of deportation, I refused to join the agents' investigation of the murders and stated I was never anyone of importance in the gang, had no access or information, and could not help because I would put my life in danger.

21. I remember that it was sometime after April 20th that the agents returned with the same offer to not deport me, but this time the two agents described to me two different scenarios. One would be a life with dignity and happiness in the United States with my family and another life of terror and fear that awaited me in El Salvador. I again declined but this time with great hesitation. I felt threatened with danger if I did not cooperate because the agents would deport me to El Salvador where I would be killed.

22. After repeatedly telling the agents I had no real information that could help them with their investigation on my first day of captivity, and after being detained for several days and nights, I told them of my fear of deportation to El Salvador (the reason for my TPS application) and my fear of gang members should I join the prosecutor's independent criminal investigation. The agents kept asking me about a 2003 murder despite the case being dismissed against me in state court.

23. That murder involved a gang fight where Adrian Soriano stabbed a rival gang member who died. Adrian Soriano wanted to testify on my behalf but my attorney never interviewed him despite his knowing that he was incarcerated.

Soriano has given a sworn affidavit testifying that I had nothing to do with the killing and that he was willing to testify on my behalf that I attach to this motion.

24. My statements to the agents and prosecutors were inconsistent because they were false. Keegan herself testified at my trial that this was the case. The prosecutors stated I was a lookout and other officer said that they saw everyone fighting. I would have testified that on the night in question I feared the approaching gang members and ran after I heard the police coming. I would have testified that I did not intent to kill anyone and did not kill anyone.

25. I would have also testified that I did not possess a firearm of any kind in furtherance of a crime of violence as charged against me. I would have testified that I never possessed a knife nor was there any blood on me when I was arrested. I would have clarified for the jury my statements and explained to them why I felt coerced into making them and why I feared deportation.

26. I never intended to kill anyone and if my lawyer informed me about my right to testify and listened to me when I told him that I wanted to testify I would have explained that to the jury and explained to them my mental state and the circumstances surrounding my statements to Keegan and AUSA Smith.

27. On or about April 21, 2005, the immigration agents that held me and questioned me stated that I could either remain happily in this country if I cooperated and helped capture the assailants in the 2003 murder, or, if not, I would be deported and face a life of fear and terror in El Salvador.

28. After shifting me from prison to prison and from state to state, without presenting me to a judge, and without allowing me to see my attorney, the agents had me sign a consent to search my home and retrieved personal effects and letters I had written to a girlfriend. The agents searched my home, retrieved property and showed these personal effects to me. They then threatened that I would not see my girlfriend or family who were present in this country again should I not tell the agents what they wanted to hear and help them with their criminal investigation.

29. I again insisted that I had TPS status and that I had work authorization, but agent Keegan continued to threaten me with immediate deportation, again mentioning my misdemeanor offenses.

30. Sometime on April 21, 2005, after my arrest, fearing deportation, and for my personal safety should I be deported, and after being held for days in different prisons and states, first in New York, then in New Jersey, then back to New York, without the help of counsel, I felt afraid, confused, desperate and coerced into signing documents that falsely stated that I gave up my rights to a lawyer and my right to remain silent even though I did not want to. I then made exaggerated,

boastful and incriminating statements to prevent my deportation and to satisfy the agents.

31. I believed that by boasting I would appear more valuable to the agents and prevent my deportation. After making various coerced statements and providing the authorities with exaggerated statements about gang-related activity, and implicating myself in a murder and attempted murder, the agents told me that they would speak to their superiors and try to have me released on the condition that I continue to cooperate with their criminal investigation.

32. I was released on May 20, 2005, after meeting with AUSA Smith before being presented to an immigration judge about one month after my initial arrest. I was told that my case was on "standby." I was to be in Keegan's charge during my release and would report to her. I was told by Keegan that if I disobeyed the agents I would be deported. In June, I was again made to meet with AUSA Smith, was not represented by counsel, and was made to repeat his statements given under the threat of deportation. Most of the statements made by me were not true. I never chased after an individual with the intent to kill him.

33. I made statements and cooperated with the agents under the threat of deportation after I was held in April, and May, and subject to Keegan's control in June and July 2005. In November 2005, Agent Keegan promised me that I would not be deported because of my assistance, statements and cooperation in her investigation.

34. Keegan then forced me to tape conversations between alleged gang members, arrange meetings, attempt to recruit gang members and inform on gang-related activities, and arrange gun purchases and gun recoveries. She kept telling me to do this so I could stay in this country and not be deported. Sometime in 2006, the agents told me that I did not tell the truth and that I was going to trial unless I pled guilty and got 20 years in jail. Because I was not guilty, I went to trial.

35. All of the defense attorneys who represented me that were appointed by the government just told me to plead guilty. None of the defense attorneys assigned to represent me cared about the details of my arrest and statements or about my interrogation by immigration authorities, or about the conditions of my release from immigration custody, or the agents' demand that I continue to cooperate upon my release in May of 2005 after being held since April of 2005.

36. Nobody asked me the details about my TPS application, or interviewed those attorneys that I was prevented from contacting or about my request for my lawyer when I was threatened with deportation and when the agents made promises of that I would not be deported to get my cooperation. My attorney did not discuss with me any motions made on my behalf or by the prosecution, and did not tell me I had the right to challenge the statements at a hearing.

37. When I went to trial, my alleged confessions made to Agent Keegan, and AUSA Smith were presented to the jury, but my lawyer never asked about any of the circumstances surrounding my making the statements, the precise dates and times of the statements or about the promises made by Agent Keegan to me.

38. My lawyer also failed to interview any of the actual participants of the murder and attempted murder charged against me.

39. Towards the end of the case, I again told my lawyer that I wanted to testify, but my lawyer never told the court that I wanted to testify and I believe that this was his decision to make and that only he could speak for me in Court. After the trial, when I got a new lawyer, the old trial attorney gave us a sworn affirmation that I told him that I wanted to testify, that he never rested my case, and that I was denied my constitutional right to testify. This affirmation is also attached to this motion. I was never allowed by my trial attorney to explain to the jury the circumstances surrounding my alleged admissions, or anything about the case.

40. I was drunk on the night that Pedro Martinez was killed by Adrian Soriano and did not intend to kill him and did not assist Soriano stab him in any way. I did not hold Pedro Martinez or assist Soriano as he stabbed him. I did not have any weapon or knife on the night of the gang fight as charged in the indictment.

41. The statements that I made to the prosecution were because of my desperate fear of being deported and facing violence and death in El Salvador. I was threatened with deportation by agent Keegan and was promised that I would not be deported if I assisted her, made statements and cooperated in her investigation into gang activity in Queens County. I did not voluntarily make these statements and did not voluntary waive my right to counsel.

42. Soriano was willing to testify on my behalf but was never interviewed by my defense counsel who did not defend me effectively and did not adequately investigate the case. Defense counsel also failed to investigate the dismissed case of murder brought against me in state court and interview Adriano Serrano who pleaded guilty to that offense as well as any of the other witnesses involved in that case. I am, as Soriano would have testified, actually innocent.

43. I therefore respectfully request that this Court vacate the conviction against me because of the denial of my right to testify and because of the ineffective assistance of my trial counsel. This Court would have honored my right to testify if defense counsel effectively defended me and presented my desire to testify, or in the alternative, set the petition for an evidentiary hearing upon due notice.

_Amilcar Gómez_   9 /19/14
Amilcar Gómez

Sworn to before me this _19th_ day of
September 2014

_Tafferlon_
Notary Public

TAFFERLON CUNNINGHAM
Notary Public - State of Florida
My Comm. Expires Nov 7, 2017
Commission # FF 38346

# Exhibit B

OMB # 1115-0170

Application for Temporary Protected Status

## START HERE - Please Type or Print

**FOR INS USE ONLY**

### Part 1.  Type of Application  *(check one)*

1. _____ This is my first application to register for Temporary Protected Status.
2. ___X___ This is my application for annual registration/re-registration. I have previously been granted Temporary Protected Status. I have maintained and continue to maintain the conditions of eligibility for Temporary Protected Status.

### Part 2.  Information about You

| | | |
|---|---|---|
| Family Name GOMEZ | First AMILCAR | Middle Initial D. |

U.S. Mailing Address - Care of N/A

| | |
|---|---|
| Street Number and Name 112-25 Jamaica Ave. | Apt. # |

| | |
|---|---|
| Town/City Jamaica | County |

| | |
|---|---|
| State NEW YORK | ZIP Code 11418 |

| | |
|---|---|
| Place of Birth (Town or City) EREGUAYQUIN   USULUTAN | (State/Country) EL SALVADOR |

| | |
|---|---|
| Country of Residence USA | Country of Citizenship EL SALVADOR |

| | |
|---|---|
| Date of Birth *(month/day/year)* 07/13/1983 | Sex  ☒ Male   ☐ Female |

| | |
|---|---|
| Marital Status  ☒ Single  ☐ Married  ☐ Divorced  ☐ Widowed | Other Names Used *(including maiden name)* NONE |

| | |
|---|---|
| Date of entry into the U.S. 1998 | Place of entry into the U.S. ARIZONA |

Manner of Arrival *(Visitor, student, stowaway, without inspection, etc.)* EWI

| | |
|---|---|
| Arrival/Departure Record (I-94) Number  N/A | Date authorized stay expired/or will expire, as shown on form I-94 or I-95  N/A |

Your current immigration Status

In Status  *(state nonimmigrant classification e.g. F-1, etc.)*   TPS

Out of Status  *(state nonimmigrant violation e.g. overstay student etc.; EWI)*   EWI

| | |
|---|---|
| Alien Registration Number  *(if any)* 094-474602 | Social Security Number 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 |

Are you now or have you ever been under immigration proceedings?
☐ Yes   ☒ No   Where _____   When _____
☐ Exclusion   ☐ Deportation   ☐ Rescission   ☐ Judicial Proceedings

### Part 3.  Information about Your spouse and children

| Name of Spouse   Last | First | Middle Initial |
|---|---|---|
| | | |

| Address (number and street) | | Apt # |
|---|---|---|
| | | |

| Town/City | State |
|---|---|
| | |

| Country | Zip/Postal Code |
|---|---|
| | |

Form I-821 (Rev. 5/22/91)N                    **Continued on back.**

---

**FOR INS USE ONLY**

Remarks

Action Stamp

Fee Stamp

Case ID#:

A#:

To Be Completed by Attorney or Representative, if any
☐ Fill in box if G-28 is attached to represent the applicant

VOLAG# 008037

ATTY State License #

**Part 3.    Information about your spouse and children (con't)**

| Date of Birth *(month/day/year)* | Date and Place of Present Marriage |
|---|---|
| Name of prior husbands/wives | Date(s) Marriage(s) Ended |

List the names, ages, and current residence of any children

| Name - (Last) | (First) | (Middle Initial) | Date of Birth | Residence |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part 4.    Eligibility Standards**

1.  Fill in the necessary information:

    I an a national of the foreign state of ___EL SALVADOR___, and I entered the United States on ___1998___, and

    I have resided in the United States since that time.

2.  To be eligible for Temporary Protected Status, you must be admissible as an immigrant to the United States, with certain exceptions. Do any of the following apply to you?

    a.    have you been convicted of any felony or 2 or more misdemeanors committed in the United States;

    b.    (i) have you ordered, incited, assisted, or otherwise participated in the persecution of any person in account of race, religion, nationality, membership in a particular social group or political opinion;

    (ii) have you been convicted by a final judgment of a particularly serious crime, constituting a danger to the community of the United States (an alien convicted of an aggravated felony is considered to have committed a particularly serious crime);

    (iii) have you committed a serious nonpolitical crime outside of the United States prior to your arrival in the United States; or

    (iv) have you engaged in or are you still engaged in activities that could be reasonable grounds for concluding that you are a danger to the security of the United States;

    c.    (i) have you been convicted of, or have you committed acts which constitute the essential elements of a crime (other than a purely political offense) or a violation of or a conspiracy to violate any law relating to a controlled substance as defined in Section 102 of the Controlled Substance Act;

    (ii) have you been convicted of 2 or more offenses (other than purely political offenses) for which the aggregate sentences to confinement actually imposed were 5 years or more;

    (iii) have you trafficked in or do you continue to traffic in any controlled substance or are or have been a knowing assisted, abettor, conspirator, to colluder with others in the illicit trafficking of any controlled substance;

    (iv) have you engaged or do you continue to engage solely, principally, or incidentally in any activity related to espionage or sabotage or violate any law involving the export of goods, technology, or sensitive information, any other unlawful activity, or any activity the purpose of which is in opposition, or control, or overthrow of the government of the United States;

Form I-821 (Rev. 05/22/91)                    ***Continued on next page***

**Do Not Write in This Block**

| Remarks | Action Stamp | Fee Stamp |
|---|---|---|
| A# | | |

**Application for Employment Authorization**   OMB #1115-

Applicant is filing under 274a.12

☐ **Application Approved. Employment Authorized / Extended** (circle one)

Subject to the following conditions: _____

☐ **Application Denied.**

  ☐ Failed to establish eligibility under 8 CFR 274a.12(a) or (c)

  ☐ Failed to establish economic necessity as required in 8 CFR 274a.12(c)

until _____ (Date).

_____ (Date).

I am applying for:

☐ Permission to accept employment

☐ **Replacement** (of lost employment authorization document).

☒ **Renewal of my permission to accept employment** (attach previous employment authorization document).

(c) (14), (18) and 8 CFR 214.2(f)

**4. Name** (Family Name in CAPS)   (First)   (Middle)
GOMEZ   AMILCAR   D.

**2. Other Names Used** (Include Maiden Name)
NONE

**3. Address in the United States**   (Number and Street)   (Apt. Number)
1225 JAMAICA AVE.

(Town or City)   (State/Country)   (ZIP Code)
JAMAICA   NEW YORK   11418

**4. Country of Citizenship/Nationality**
EL SALVADOR   EL SALVADOR

**5. Place of Birth** (Town or City)   (State/Province)   (Country)
EREGUAYQUIN   USULUTAN   EL SALVADOR

**6. Date of Birth** (Month/Day/Year)   **7. Sex**
7/13/1983   ☒ Male  ☐ Female

**8. Marital Status**
☐ Married   ☒ Single
☐ Widowed   ☐ Divorced

**9. Social Security Number** (Include all Numbers you have ever used)
12-90-1375

**10. Alien Registration Number** (A-Number) or I-94 Number (if any)
94-474602   N/A

**11. Have you ever before applied for employment authorization from INS?**
☒ Yes (If yes, complete below)   ☐ No

Which INS office?   Date(s)
EAC   0726/01

Results (Granted or Denied - attach all documentation)
GRANTED

**12. Date of Last Entry into the U.S.** (Month/Day/Year)
1998

**13. Place of Last Entry into the U.S.**
TEXAS

**14. Manner of Last Entry** (Visitor, Student, etc.)
EWI

**15. Current Immigration Status** (Visitor, Student, etc.)
TPS GRANTED

**16.** Go to Part 2 of the instructions, Eligibility Categories. In the space below, place the letter and number of the category you selected from the instructions (For example, (a)(8), (c)(17)(iii), etc.).

Eligibility under 8 CFR 274a.12

( C ) ( C ) ( 19 )

## Certification

**Your Certification:** I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Furthermore, I authorize the release of any information which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking. I have read the instructions in Part 2 and have identified the appropriate eligibility category in Block 16.

| Signature | Telephone Number | Date |
|---|---|---|
| Amilcar Gomez | (718)849-1011 | 10/18/02 |

**Signature of Person Preparing Form if Other Than Above:** I declare that this document was prepared by me at the request of the applicant and is based on all information of which I have any knowledge.

| Print Name | Address | Signature | Date |
|---|---|---|---|
| JESUS ORTEGA 10/18/02  LAW OFFICE OF BRUNO OF BEMBI  62 NICHOLS CT., SUITE 202, HEMPSTEAD, NY 11550 | (516) 483-7372 | | 10/18/02 |

Initial Receipt   Resubmitted   Relocated   Completed

U.S. Department of Justice

## Application for Employment Authorization

**Do Not Write in This Block.**

| Remarks | Action Stamp | Fee Stamp |
|---|---|---|
| A# | | |

Applicant is filing under §274a.12 _____

☐ Application Approved. Employment Authorized / Extended (Circle One) _____ until _____ (Date).

☐ Subject to the following conditions: _____ (Date).

☐ Application Denied.
  ☐ Failed to establish eligibility under 8 CFR 274a.12 (a) or (c).
  ☐ Failed to establish economic necessity as required in 8 CFR 274a.12(C)(14), (18) and 8 CFR 214.2(f)

I am applying for:
  ☐ Permission to accept employment.
  ☐ Replacement (of lost employment authorization document).
  ☑ Renewal of my permission to accept employment (attach previous employment authorization document).

**1. Name (Family Name in CAPS) (First) (Middle)**
GOMEZ    AMILCAR    DE JESUS

**2. Other Names Used (Include Maiden Name)**
N/A

**3. Address in the United States (Number and Street) (Apt. Number)**
112-25 JAMAICA AVE.    #.2

(Town or City) (State/Country) (ZIP Code)
JAMAICA    NY    11418

**4. Country of Citizenship/Nationality**
EL SALVADOR

**5. Place of Birth (Town or City) (State/Province) (Country)**
EREGUAYQUIN    USULUTAN    EL SALVADOR

**6. Date of Birth** **7. Sex**
07/13/1983    ☑ Male  ☐ Female

**8. Marital Status**
☐ Married  ☑ Single
☐ Widowed  ☐ Divorced

**9. Social Security Number (Include all Numbers you have ever used)(if any)**
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

**10. Alien Registration Number (A-Number) or I-94 Number (if any)**
94-474-602

**11. Have you ever before applied for employment authorization from INS?**
☑ Yes (If yes, complete below)    ☐ No

Which INS Office?    Date(s)
EAC    03/10/2003

Results (Granted or Denied - attach all documentation)
GRANTED

**12. Date of Last Entry into the U.S. (Month/Day/Year)**
1998

**13. Place of Last Entry into the U.S.**
TEXAS

**14. Manner of Last Entry (Visitor, Student, etc.)**
EWI

**15. Current Immigration Status (Visitor, Student, etc.)**
TPS GRANTED

**16. Go to Part 2 of the Instructions, Eligibility Categories. In the space below, place the letter and number of the category you selected from the instructions (For example, (a)(8), (c)(17)(iii), etc.).**

Eligibility under 8 CFR 274a.12

( C )  ( C )  ( 19 )

**Certification.**

**Your Certification:** I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Furthermore, I authorize the release of any information which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking. I have read the Instructions in Part 2 and have identified the appropriate eligibility category in Block 16.

**Signature**    **Telephone Number**    **Date**
Amilcar Gomez    718-849-1011    1/11/2005

**Signature of Person Preparing Form, If Other Than Above:** I declare that this document was prepared by me at the request of the applicant and is based on all information of which I have any knowledge.

**Print Name**    **Address**    **Signature**    **Date**
MIGUEL GONZALES    1/11/2005

| | Initial Receipt | Resubmitted | Relocated | | Completed | | |
|---|---|---|---|---|---|---|---|
| | | | Rec'd | Sent | Approved | Denied | Returned |
| | | | | | | | |

BRUNO JOSEPH BEMBI
Attorney at Law
62 Nichols Court, Suite 202
Hempstead New York 11550

Form I-765 (Rev. 5/09/02)Y

**Part 4. Eligibility Standards (con't)**

(v) have you engaged in or do you continue to engage in terrorist activities;

(vi) have you engaged in or do you continue to engage or plan to engage in activities in the United States that would have potentially serious adverse foreign policy consequences for the United States;

(vii) have you been or do you continue to be a member of the Communist or other totalitarian party, except when membership was involuntary; and

(viii) have you participated in Nazi persecution or genocide.

d. have you been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law or ordinance, excluding traffic violations, or been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency or similar action;

e. have you committed a serious criminal offense in the United States and asserted immunity from prosecution;

f. have you within the past 10 years engaged in prostitution or procurement of prostitution or do you continue to engage in prostitution or procurement of prostitution;

g. have you been or do you intend to be involved in any other commercial vice;

h. have you been excluded and deported from the United States within the past year, or have you been deported or removed from the United States at government expense within the last 5 years (20 years if you have been convicted of an aggravated felony);

i. have you ever assisted any other person to enter the United States in violation of the law;

j. (i) do you have a communicable disease of public health significance,

(ii) do you have or have you had a physical or mental disorder and behavior (or a history of behavior that is likely to recur) associated with the disorder which has posed or may pose a threat to the property, safety or welfare of yourself or others;

(iii) are you now or have you been a drug abuser or drug addict;

k. Have you entered the United States as a stowaway;

l. are you subject to a final order for violation of section 274C (producing and/or using false documentation to unlawfully satisfy a requirement of the Immigration and Nationality Act);

m. do you practice polygamy;

n. were you guardian of, and did you accompany another alien who was ordered excluded and deported from the United States;

o. have you detained, retained, or withheld the custody of a child, having a lawful claim to United States citizenship, outside the United States from a United States citizen granted custody.

If any of the above statements apply to you, indicate which one(s) by number reference on the line below (for example"2k") and include a full explanation on a separate piece of paper. If you were ever arrested you should provide the disposition (outcome) of the arrest (for example, "case dismissed") from the appropriate authority.

<u>n/a</u>

**PLEASE NOTE: If you placed any of the following numbered references on the line above you may be eligible for a waiver of the grounds described in the statements: 2e; 2f; 2g; 2h; 2i; 2j; 2k; 2l; 2m; 2n; 2o. form I-601 or I-724 are the Service forms used to request a waiver. These forms are available at INS offices.**

Form I-821 (Rev. 05/22/91)                                                     *Continued on back.*

**Part 5.     Your Certification**

Your Certification: I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Copies of documents submitted are exact photocopies of unaltered original documents and I understand that I may be required to submit original documents to the INS at a later date. Furthermore, I authorize the release of any information from my records which the Immigration and Naturalization Service needs to determine eligibility for the benefit that I an seeking.

Signature: _Yamicar Gomez_     Date: _10/18/02_     Telephone No.: _(718)849-1011_

Signature of Person Preparing Form if other than above:

I declare that I prepared this document at the request of the person above and that it is based on all information of which I have any knowledge.

Print Name: JESUS ORTEGA 10/18/02     Signature: _Jesus Ortega_     Date: _10/18/02_
LAW OFFICE OF BRUNO OF BEMBI
Address: 62 NICHOLS CT., SUITE 202, HEMPSTEAD, NY 11550   (516) 483-7372

**Checklist**

_____ you answered each question?
_____ signed the application?

_____:

_____ fee for this application or a written request for a waiver of the filing fee (see instructions, item 12)?

_____ evidence to prove identity, nationality, date of entry and residence?

_____ supporting documents (fingerprint charts, pictures etc.) for each application?

_____ COVER ALL THE CONDITIONS FOR ELIGIBILITY OR TO GIVE INSTRUCTIONS FOR EVERY SITUATION.
_____ READ ALL THE INSTRUCTIONS AND STILL HAVE QUESTIONS, PLEADE CONTACT YOUR NEAREST
_____ENDED THAT YOU KEEP A COMPLETE COPY OF THIS APPLICATION FOR YOUR RECORDS.

**Notice of Action**

ment of Homeland Security
Citizenship and Immigration Services

# THE UNITED STATES OF AMERICA

| Number: | | Case Type: | |
|---|---|---|---|
| EAC-05-155-70567 | | I-765 - Application for Employment Authorization Document | |

| | | | Applicant: | A094474602 |
|---|---|---|---|---|
| ed Date: | Priority Date: | | | GOMEZ, AMILCAR |
| ay 06, 2005 | | Page   1 OF 1 | ASC Code: | |
| Date: | | | | |
| 08, 2005 | | | | |

ENTERED MAR 1 6 2005

| 0 BEMBI | Notice Type: | Receipt Notice |
|---|---|---|
| CHOLS COURT SUITE 202 | | |
| STEAD NY 11550 | Amount Received: | $175.00 |

application has been received and forwarded on for further processing.  **Please notify us immediately if any of** information is incorrect.  If you find it necessary to contact this office in writing, you must include a copy of pt notice with your inquiry.

**ETRICS-**
t step is to have your biometrics taken, if required, at a US Citizenship and Immigration Services (USCIS) an Support Center (ASC).

**SE NOTE-**
WILL SCHEDULE YOUR BIOMETRICS APPOINTMENT.  You will be receiving an appointment notice with a , date and place where you will have your fingerprints and/or photos taken.

**T TO BRING TO Your appointment -**
fhis letter and your photo identification to your appointment.  Acceptable kinds of photo identification are:
ort or national photo identification issued by your country,
s license,
y photo identification, or
sued photo identification card.

ringing this letter and photo identification, we cannot process you.
copy of all receipt notices received from USCIS in relation to your current application for benefits.

your local office processing times may be obtained by calling the NCSC at 1-800-375-5283.

access, you can visit the Bureau of Citizenship and Immigration Services website at  www.BCIS.gov
uable information about forms, filing instructions, and immigration services and benefits.

CITIZENSHIP AND IMMIGRATION SERVICES  -  VERMONT SERVICE CENTER

Service Center: 1-800-375-5283

Form I-797C (Rev. 11/28/08) N

**U.S. Citizenship and Immigration Services**

Search  [ Search ]

| FORMS | NEWS | RESOURCES | LAWS | OUTREACH | ABOUT US |

- Check My Case Status
- Sign-in to My Account
- Sign-up for Case Updates
- Check Processing Times
- Change Of Address Online
- e-Request
- Office Locator

## My Case Status

Para tener acceso a este sitio en **Español**, presione aquí

---

**Your Current Case Status for Form I765, APPLICATION FOR EMPLOYMENT AUTHORIZATION**

Enter your receipt number

EAC0515570567

[ Check Status ]

    

Acceptance    Initial Review    Decision    **Post Decision Activity**    Card/ Document Production

Your Case Status:
Post Decision Activity

**Post Decision Activity**

On February 12, 2003, we mailed you a notice that we have approved this I765 APPLICATION FOR EMPLOYMENT AUTHORIZATION. Please follow any instructions on the notice. If you move before you receive the notice, call customer service at 1-800-375-5283.

For approved applications/petitions, post-decision activity may include USCIS sending notification of the approved application/petition to the National Visa Center or the Department of State. For denied applications/petitions, post-decision activity may include the processing of an appeal and/or motions to reopen or reconsider and revocations.

---

You can register for automatic case status updates by email and text message by creating an account.
To submit a service request for an inquiry for an application please click e-Request .

---

**Processing Times**

1). Select a form type

Select one...   ▼

[ Next ]  [ Reset ]

---

View national volumes and trends for all applications

**USCIS Privacy Act Statement**

**Case Status Online**

**Authority:** The information requested by My Case Status is collected pursuant to the Immigration and Nationality Act of 1952, Public Law 82-414, as amended.

**Purpose:** The primary purpose for collecting your case receipt number is to provide you with a status update and estimated processing times for a pending immigration benefit application or petition.

**Routine Uses:** The information may be used by and disclosed to DHS personnel and contractors or other agents who need the information to assist in activities related to providing status information on a pending immigration benefit application or petition. Additionally, DHS may share the information with law enforcement or other government agencies as necessary to respond to potential or actual threats to national security pursuant to the agency's published Privacy Policy and the routine uses outlined in the Benefits Information System system of records notice, DHS-USCIS-007, September 29, 2008 73 FR 56596.

**Disclosure:** The information you provide is voluntary. However, failure to provide the requested information may prevent USCIS from providing a status update on your pending case.

**OMB control no. 1615-0080**

**Expiration date 6-30-2012**

# Exhibit C

Case 1:06-cr-00613-SJ   Document 155-2   Filed 09/30/14   Page 20 of 98 PageID #: 1574

```
 1
 2    UNITED STATES GRAND JURY              ORIGINAL
 3    EASTERN DISTRICT OF NEW YORK
 4    - - - - - - - - - - - - - - - - - - - - - - - - - - -X
      UNITED STATES OF AMERICA
 5
                          - against -
 6
      HENRY CHAN,
 7
 8                                        Defendant.
      - - - - - - - - - - - - - - - - - - - - - - - - - - -X
 9
                              United States Courthouse
10                            225 Cadman Plaza
                              Brooklyn, New York
11
                              June 21, 2006
12                            10:50 a.m.
13
      APPEARANCES:
14
                      MARSHALL MILLER,
15                    Assistant U.S. Attorney
16
      WITNESS:
17                        ERIN KEEGAN
18
19                        Grand Jury Reporter:
20                        Alice Schulman
21
22
23
      Proceedings recorded by mechanical stenography,
24    transcript produced by (CAT) Computer Aided
      Transcription.
25
```

GOVERNMENT
EXHIBIT
3500-EK-48

06CR613(S-4 (SJ)

2      the organization provided information are to

3      work off charges against them; is that correct?

4           A.      Yes.

5           Q.      In other words, they might face

6      prosecution, but instead they try to provide

7      information; is that correct?

8           A.      Yes.

9           Q.      Other people, is it fair to say that

10     some individuals provide information because

11     they might be deported?

12          A.      Yes.

13          Q.      And is it also fair to say that some

14     people provide information because they get paid

15     to provide information?

16          A.      Yes.

17          Q.      And with respect to the cooperating

18     witness that you described, is it fair to say

19     that that cooperating witness is going to plead

20     guilty to charges against him?

21          A.      He is.

22          Q.      And those charges include a murder

23     and attempted murder; is that right?

24          A.      Yes.

25          Q.      And those charges relate to

# Exhibit D

U.S. Department of Justice

Immigration and Naturalization Service

# Record of Deportable/Inadmissible Alien

| Family Name (CAPS) | First | Middle | Sex | Hair | Eyes | Cmplxn |
|---|---|---|---|---|---|---|
| GOMEZ, Amilcar | | | M | BLK | BRO | LBR |

| Country of Citizenship | Passport Number and Country of Issue | Case No: XNY0504000075 | Height | Weight | Occupation |
|---|---|---|---|---|---|
| EL SALVADOR | | File Number A094 474 602 | 68 | 120 | |

| U.S. Address |
|---|
| 112-25 JAMAICA AVENUE RICHMOND HILL, NEW YORK 11418 |

| Date, Place, Time, and Manner of Last Entry | Passenger Boarded at | Scars and Marks |
|---|---|---|
| Unknown Date, Unknown Time, UNK, ENTERED WITHOUT INSPECTION | | |

| Number, Street, City, Province (State) and Country of Permanent Residence | F.B.I. Number | ☐ Single ☐ Married |
|---|---|---|
| | 234644AC1 | ☐ Divorced ☐ Widower ☐ Separated |

| Date of Birth | Date of Action | Location Code | Method of Location/Apprehension |
|---|---|---|---|
| 07/13/1983  Age: 21 | 04/15/2005 | XNY/XNY | OTF 511.2.3 |

| City, Province (State) and Country of Birth | AR ☒ | Form: (Type and No.) | Lifted ☐ | Not Lifted ☐ | At/Near | Date/Hour 04/15/2005  0000 |
|---|---|---|---|---|---|---|
| NONE, EL SALVADOR | | | | | | |

| NIV Issuing Post and NIV Number | Social Security Account Name | By |
|---|---|---|

| Date Visa Issued | Social Security Number | Status at Entry EWA Other | Status When Found |
|---|---|---|---|

| | | Length of Time Illegally in U.S. OVER 1 YEAR |
|---|---|---|

| Immigration Record POSITIVE - See Narrative | Criminal Record See narrative |
|---|---|

| Name, Address, and Nationality of Spouse (Maiden Name, if Appropriate) | Number and Nationality of Minor Children UNKNOWN |
|---|---|

| Father's Name, Nationality, and Address, if Known , Unknown | Mother's Present and Maiden Names, Nationality, and Address, if Known , Unknown |
|---|---|

| Monies Due/Property in U.S. Not in Immediate Possession | Fingerprinted? Yes ☒ No ☐ | INS Systems Checks See Narrative | Charge Code Word(s) I6A |
|---|---|---|---|

| Name and Address of (Last)/(Current) U.S. Employer | Type of Employment | Salary Hr. / / | Employed from/to / /    / / |
|---|---|---|---|

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

INS SYSTEMS CHECKS
Central Index System Positive
Computer Linked Application Information Management System Positive
Deportable Alien Control System Negative
National Crime Information Center Positive
Treasury Enforcement Communications System Negative

Narrative Title: Record of Deportable/Excludable Alien
Narrative Created by KEEGAN

SUBJECT was encountered in conjunction with Operation Community Shield, an ICE Headquarters/ SAC NY investigation of violent street gangs in the New York City area. SUBJECT is a known member of the MS-13 street gang in Queens, New York.

SUBJECT is a citizen and national of El Salvador who entered the United States at an unknown location on an unknown date.

SUBJECT was arrested by the Hempstead Police Department on February 26, 2003 and charged with Criminal Possession of Stolen Property in the Fourth Degree.  SUBJECT was convicted of Attempted Criminal Possession of Stolen Property in the Fifth Degree in violation of section 110/165.40 of the New York State Penal Law pursuant to a plea of guilty entered

GOVERNMENT EXHIBIT 3500-EK-2 ~~06CR613(S-4(SJ)~~

ERIN KEEGAN
SPECIAL AGENT

| ...en has been advised of communication privileges. _____ (Date/Initials) | (Signature and Title of INS Official) |
|---|---|

| Distribution: FILE STATS | Received: (Subject and Documents) (Report of Interview) Officer: ERIN KEEGAN |
|---|---|
| | on: April 15, 2005 at 1545 (time) |
| | Disposition: Warrant of Arrest/Notice to Appear |

S. Department of Justice
Immigration and Naturalization Service

Continuation Page for Form   I-213

| Alien's Name | File Number | Date |
|---|---|---|
| GOMEZ, Amilcar | Case No: XNY0504000075<br>A094 474 602 | 04/15/2005 |

on February 17, 2004 in the Nassau County First District Court under case number 2003NA003965.  SUBJECT was sentenced on May 4, 2004  to a term of one (1) year probation. SUBJECT is currently on probation in Queens County with a maximum expiration date of May 4, 2005.

SUBJECT applied for Temporary Protective Stataus (TPS) in 2001 and was denied TPS on May 27, 2003.  There are no applications pending with BCIS.  On April 18, 2005 the New York State Court of Appeals, Second Judicial Department, was contacted by Special Agent Keegan who was informed that there are no appeals on record for this docket number.

| Signature | Title |
|---|---|
| JIN KEEGAN | SPECIAL AGENT |

2 of 2 Pages

Form I-831 Continuation Page (Rev. 6/12/92)

# Exhibit E

Form I-215B
(Rev. 9-1-72)

## UNITED STATES DEPARTMENT OF JUSTICE

IMMIGRATION AND NATURALIZATION SERVICE

### RECORD OF SWORN STATEMENT IN AFFIDAVIT FORM

# AFFIDAVIT

Case No: XNY0504000075

IN RE: Amilcar Gomez                                    FILE NO. 094 474 602

EXECUTED AT NEW YORK, NY                          DATE April 19, 2005

Before the following officer of the U.S. Immigration and Naturalization Service: ERIN KEEGAN

in the English                      language. Interpreter ERIN KEEGAN                      used.

I, AMILCAR GOMEZ AKA: Gomez, JOSE                , acknowledge that the above-named officer has identified himself to me as an officer of the United States Immigration and Naturalization Service, authorized by law to administer oaths and take testimony in connection with the enforcement of the Immigration and Nationality laws of the United States. He has informed me that he desires to take my sworn statement regarding: My Immigration Status

He has told me that my statement must be freely and voluntarily given and has advised me of these rights:

"You have the right to remain silent.

Anything you say can be used against you in court, or in any immigration or administrative proceeding.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

I am willing to make a statement without anyone else being present. I swear that I will tell the truth, the whole truth, and nothing but the truth, so help me, God.

Being duly sworn, I make the following statement:

My true and correct name is Amilcar Gomez. I was born in Erequeyquin, El Salvador on July 13, 1983. I am a citizen and national of El Salvador, as are my parents. I last entered the United States at or near Matamoro, Texas in September 1999. I was not inspected by an Immigration Officer. I had filed an application for TPS with Immigration. I am in good physical health. I have never served in the U.S. Armed Forces. I have fear of returning to El Salvador.

Amilcar Gomez 04/19/05

GOVERNMENT
EXHIBIT
3500-EK-7

06CR613(S-4)(SJ)

# Affidavit Page

       I have ( or have had read to me ) this statement, consisting of ___ pages ( including this page). I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above-named officer of the Immigration and Naturalization Service. I have initialed each page of this statement ( and the corrections noted on pages(s) ___

Signature: _American Gomez_____

Sworn and Subscribed to before me at: _26 Federal Plaza, NY, NY_
On _4|19|05_____

_E. Key_   _E. KEEGAN_____, **Immigration Agent**
          Officer, United States Immigration and Naturalization Service

Witnessed by: _____

Page _2_ of _2_

**GOVERNMENT EXHIBIT**
3500-EK-8

06CR613(S-4 (SJ)

# Exhibit F

OFFICE OF THE DISTRICT ATTORNEY

THE COUNTY OF QUEENS

GRAND JURY BUREAU
125-01 QUEENS BOULEVARD
QUEENS, N.Y.   11415

ANILCAN GOMEZ

GJ CASE NO. "554/2003"

112-25 JAMAICA AVE
JAMAICA,NY

DOCKET NOS.   2003QN009932

PLEASE BE ADVISED THAT ON APRIL 04, 2003, A MATTER

PENDING BEFORE THE GRAND JURY OF THE COUNTY OF QUEENS

ENTITLED PEOPLE VS. ANILCAN GOMEZ WAS DISMISSED

BY THE GRAND JURY.

ASSISTANT DISTRICT ATTORNEY

IN CHARGE - INDICTMENT BUREAU

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF QUEENS

CERTIFICATE OF DISPOSITION
NUMBER:  25742

THE PEOPLE OF THE STATE OF NEW YORK
VS

GOMEZ, ANILCAN
Defendant

07/03/1983
Date of Birth

112 25 JAMAICA AVE
Address

2346550M
NYSID Number

JAMAICA                      NY
City                    State  Zip

03/01/2003
Date of Arrest/Issue

Docket Number: 2003QN009932

Summons No:

125.25 265.01 125.25
Arraignment Charges

Case Disposition Information:

| Date | Court Action | Judge | Part |
|------|--------------|-------|------|
| 04/04/2003 | DISMISSED | GERALD, L | APAR3 |

NO FEE CERTIFICATION

_ GOVERNMENT AGENCY        _ COUNSEL ASSIGNED

_ NO RECORD OF ATTORNEY READILY AVAILABLE. DEFENDANT STATES COUNSEL WAS ASSIGNE

SOURCE  _ ACCUSATORY INSTRUMENT   _ DOCKET BOOK/CRIMS   _ CRC3030[CRS963]

I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN
THIS COURT.

KACHKAROV, N
COURT OFFICIAL SIGNATURE AND SEAL

01/12/2005
DATE          FEE: NONE

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT
SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)

# Exhibit G

USA V. GOMEZ

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA,                    : 06-CR-0613 (S-2) (SJ)
                                             :
                                             :
-against-                                    : United States Courthouse
                                             : Brooklyn, New York
                                             :
                                             :
AMILCAR GOMEZ,                               : March 31, 2009
                    Defendant.               : 9:30 a.m.

- - - - - - - - - - - - X


CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE STERLING JOHNSON
UNITED STATES DISTRICT COURT JUDGE, AND A JURY


- - -


A P P E A R A N C E S:

For the Government:              United States Attorneys Office
                                 Eastern District of New York
                                 271 Cadman Plaza East
                                 Brooklyn, New York  11201
                                 BY:    JASON JONES, ESQ.
                                 BY:    CARTER BURWELL, ESQ.


For the Defendant:               Law Office of Scott Auster, Esq,
                                 65 Highview Drive
                                 Carmel, NY 10512
                                 BY:    SCOTT AUSTER, ESQ.


Court Reporter:                  Nicole M. Warren, CSR, RMR, CRR
                                 Official Court Reporter


Proceedings recorded by computerized stenography
Transcript produced by Computer-aided Transcription.

Nicole M. Warren, CSR, RMR, CRR

defendant tell you whether or not he was one of them?

A.  Yes, he said that "Crazy," himself -- he mentioned "Crazy," himself, and "Buddha" specifically giving chase to one individual, that "Buddha" somehow fought the individual.  The individual ended up on the ground, at which point while he stood lookout, "Crazy" began stabbing this person as well.

Q.  When you said that he stood lookout, is that something that he told you?

A.  Yes, he said he stood -- he got there almost -- I think "Buddha" was a step or two ahead of him, in front of him.  He got there basically almost simultaneously and was looking back and forth for the police while "Crazy" stabbed him.

        Eventually, the police came and the three of them -- and I think "Coyote" also -- all ran.

Q.  When you said that the -- they ran, what caused them to run?  Did he tell you?

A.  The police.

Q.  Did he tell you -- did the defendant tell you whether or not he spoke to the police later in the evening or later the next day?

A.  Yes.  Well, he told me that the four of them ran.  Three of them were apprehended -- himself and "Crazy" and "Buddha."

        He said he was interviewed by the police and that he did not tell them what he saw or what he himself did.

Q.  Did Mr. Gomez mention to you whether or not any gang

members in MS-13 corresponded with him after the murder?

A.   Yes.

Q.   What, if anything, do you remember about that?

A.   He said that "Crazy" corresponded with him and asked him to basically testify in his behalf to say that "Crazy" didn't do it.

Q.   Regarding that murder that you just -- we've just discussed, did the defendant tell you what his intent was that evening?

A.   I'm sorry.  Could you say again?

Q.   Did he tell you what his intent was that evening, what he was trying to do?

A.   Well, he stated specifically -- I don't think he stated it in those terms in terms of what his intent was but --

        MR. AUSTER:  Objection.  Again, if the witness knows the answer, that's fine.  If he's thinking or if he's believing about it, I'm asking it be stricken, your Honor.

        THE COURT:  He hasn't even answered the question yet.

        Repeat the question, Mr. Jones.

BY MR. JONES:

Q.   Did the defendant tell you what the purpose was in him chasing down that individual?

A.   Yeah.

        THE COURT:  The answer to that is "yes" or "no."

        THE WITNESS:  Yes.

        Nicole M. Warren, CSR, RMR, CRR

the crimes that were -- well, I'll withdraw that.

When you say shortly before that, are we talking a matter of days, weeks, or months?

You mean in terms of when the agents met with him -- first met with him to when I met with him?

That's correct.

I can't tell you specifically.  It certainly wasn't months.

It wasn't months.

No.

But it could have been a month?

It could have been.  It could have been less.  I'm not sure.

And was Mr. Gomez represented by counsel during these meetings?

He was not.

Was he advised that he had the right to have counsel?

He was not.

If he had sought counsel, would he have been allowed to counsel?

THE COURT:  Sustained.

MR. AUSTER:

Now, you described certain events that you tell us Gomez spoke to you about in your meetings in June, 2005.

Yes.

By the way, you mentioned June 14th as the first meeting;

Nicole M. Warren, CSR, RMR, CRR

MR. AUSTER:  Objection, your Honor.

THE COURT:  I'll sustain that.

BY MR. BURWELL:

Q.  Officer Ostrowski, if you could just describe exactly what you saw in this three-on-one fight.

A.  We saw three individuals pushing one individual back.  We saw one individual going back to confront the other three individuals.

Q.  What happened next?

A.  As we proceeded to stop the car, one of the individuals started to what appeared to punch the other individual in the chest area.

As we exited the car, everyone kind of looked up and noticed that the police were just a few feet from them; and the three individuals on the left started to run southbound on 149 Street back towards Jamaica Avenue.

Q.  Officer Ostrowski, let me stop you.  Just to be clear, you said you saw one individual make some motion at another individual; is that correct?

A.  Yes.

Q.  Which person was making the motion to which person?

A.  There was three individuals.  The individual with the white long sleeved T-shirt was doing the punching motions.

Q.  And he was one of those group of three people who was fighting against the other person; is that --

A.  What did he do?

Q.  Yeah.

A.  I don't really remember what he did.  That's a long time ago.

Q.  But you -- so, you ran past this individual and you proceeded to chase the three.

A.  I ran past nobody.  They were in front of the RMP.  They were in front of the police car.

Q.  Uh-huh.

A.  And, obviously, when you get out of the door, if they ran this way, they started to run in the opposite way that the police car was facing.  So, they were actually running like --

Q.  Towards Jamaica Avenue?

A.  Yeah, backwards.

Q.  So, they ran past you.  Would that be fair?

A.  Well, they ran to the sidewalk; and then they ran past me.

Q.  Right.  Okay.

A.  Yes.

Q.  And is it at this point that you exit your vehicle and chased after them?

A.  Just about, yes.

Q.  What did Officer Kranenberg do?

A.  I don't know.  I don't know.

Q.  Did he engage --

A.  Oh, he was behind me; but I don't know exactly where he was

P.O. JOHN KRANENBERG - DIRECT BY MR. BURWELL          379

they noticed us.

        MR. AUSTER:  Objection, your Honor.

BY MR. BURWELL:

Q.  If you could just describe what you saw those three

individuals do, what they did when you approached.

A.  They ran.

Q.  Which way did they run?

A.  They ran southbound on 149 Street.  One gentleman continued

straight down toward Jamaica Avenue.  Two other gentlemen made

a right turn onto Lowe Court, going westbound.

        We followed them to 148 Street where they made a left

turn going southbound and as we turned the corner, I could only

see one of the gentlemen walking about halfway down the block

and I couldn't see the other guy.

        I immediately stopped.  I looked.  I started looking

under cars; and sure enough, the gentleman who had been lunging

at the other gentleman was laying under a car.

        I also forgot to mention that as we were pulling up,

the gentleman who was one against three actually looked at us,

pointed at the blood on his shirt, and then pointed at the guy

in the white shirt; and pretty much that's the guy that I went

after.  He ended up being underneath a van.

        I pulled him out, arrested him, and we held him

for -- we arrested him.

Q.  Let me show you what's been marked as Government Exhibit

# Exhibit H

3/1/03
1650 hrs

GOMEZ, AMILCAR DOB: 7/03/83
112-25 Jamaica Ave (Apt 2)
Richmond Hills, NY

(AKA JOSE)


I was walking down the street when I saw Crazy was being beaten up by 4 or 5 guys then the guys who hit Crazy ran because they saw Crazy's friends coming to his rescue then I saw that they beat only the guy that remained and then I saw the patrol cars and I ran to near the gorcery where I was arrested.

/s/ Amilcar Gomez
/s/ Det. Miriam Piretti #2708 1705 Hours


GOVERNMENT
EXHIBIT
202b

06CR613 (SJ)

# Exhibit I

GOVERNMENT
EXHIBIT
215
06CR613(S-4)(SJ)

146 STREET

JAMAICA AVENUE

146-01
146-03
146-07
146-09
146-11
146-13
146-27 KEY FOOD STORE

BLOOD SAMPLE

LOWE CT.

90-39
90-35
90-36

146-02
146-04
146-06
90-15
90-11
90-19
146-15
146-14
90-10

TIRE PRINT W/ BLOOD

149 STREET

149-01
149-09
149-11
149-13
149-15
149-17
149-19
149-21
149-23
149-25
149-27

90-23
90-11

90-46
90-44
90-35
90-36
90-20
90-16
90-10
146-20

FOLDING KNIFE
BLOOD STAIN

BLOOD SAMPLE W/ PHONE

90 AVENUE

150 STREET

JAMAICA AVENUE

RUFUS KING PARK

N

NYPD CRIME SCENE UNIT
RUN # 032/280  103 PRECINCT
HOMICIDE X 2  03/01/03
VICINITY OF JAMAICA AVE & 146 STREET
DET. M. CUNNINGHAM ASSIGNED

Prepared 3/2003 by
Det. M. Cunningham
"Not drawn to scale"

Q0300962                    EDUARDO E. LEASON JR.                        Page 7

**FORENSIC BIOLOGY:**
Scalp hair and blood are retained for forensic biologic analysis.

Stuart Graham, M.D.
City Medical Examiner - II

SG:wwd
DRAFT
03/07/03:jg
Job No. 00-18785
Computer No. 30300962
FINAL 6.21.03

**Q0300960**  **PEDRO MIGUEL MARTINEZ**  Page 9

**FORENSIC BIOLOGY:**
Specimens are retained for forensic biologic analysis.

Stuart Graham, M.D.
City Medical Examiner - II

SG:wwd
DRAFT
03/07/03:jg
Job No. 00-18784
Computer No. 30300960
FINAL 6.20.03

# Exhibit J

U.S. Department of Homeland Security
601 W. 26 St., Ste. 700
New York, New York 10001



**U.S. Immigration and Customs Enforcement**

November 1, 2005

MEMORANDUM FOR:     Martin D. Ficke
                    Special Agent in Charge, New York

FROM:               Erin Keegan
                    Special Agent

SUBJECT:            Deferred Initiation of Removal Proceedings Request for Amilcar
                    GOMEZ, A# 94 474 602

Amilcar GOMEZ, A94 474 602, has agreed to cooperate with U.S. Immigration and Customs
Enforcement, Special Agent-in Charge, New York Field Office (ICE/SAC NY) in an ongoing
criminal investigation, under Operation Community Shield, case #: NY16BR05NY0015. This is a
racketeering investigation targeting the Mara Salvatrucha (MS-13) street gang operating in the New
York City Metropolitan area. It is anticipated that violations of 18USC 1959, Violent Crimes in Aid
of Racketeering, will be brought against members of the street gang. The following information
pertains to Amilcar GOMEZ.

**Date of Birth, Birthplace and Nationality:** July13, 1983, Ereguayquin Usulutan, El Salvador.

**Address:** 112-25 Jamaica Avenue, Jamaica, NY 11418.

**Date and manner of last entry:** Amilcar GOMEZ last entered the United States in 1998 via the
U.S./Mexico border, through Arizona, without being inspected by an Immigration Officer.

**Present immigration status and availability of any administrative relief:**
Amilcar GOMEZ is currently present in the United States without permission. On October 18, 2002,
Amilcar GOMEZ filed an I-821 with the Immigration and Naturalization Service for Temporary
Protective Status, which was denied on July 24, 2003 due to lack of sufficient documentation. On
February 6, 2005, Amilcar GOMEZ re-filed an I-821 for Temporary Protective Status and an I-765
for Employment Authorization, based on the pending I-821. Both applications are still pending with
the Vermont Service Center. However, due to GOMEZ's criminal history, he is ineligible to receive
Temporary Protective Status and it is anticipated that the I-821 and I-765 will be denied.

**Grounds of inadmissibility / deportability:** This individual is amenable to deportation under
212(a)(6)(A)(i) and 212(a)(2)(A)(i)(I).

GOVERNMENT
EXHIBIT
3500-EK-27
06CR613(S-4 (SJ)

Deferred Initiation of Removal Proceedings Request for Amilcar GOMEZ, A# 94 474 602
Page 2

**All periods of residence in the United States:** 1998 to present.

**Physical / mental conditions requiring treatment in the United States:** None

**Family situation (spouse, sons, daughters and parents):**

| Name | Age | Relationship | Location | Status |
|------|-----|--------------|----------|--------|
| Orbelina Gomez | 40 | Mother | 112-25 Jamaica Ave., Jamaica, NY 11418 | EWI |
| Amilcar Gomez | 45 | Father | 112-25 Jamaica Ave., Jamaica, NY 11418 | EWI |

**Criminal activities in the U.S.:**

| Criminal offense | Date & Place | Disposition |
|------------------|--------------|-------------|
| Criminal Possession of Stolen Property | Arrest 02/26/03, Hempstead, NY | Convicted of Attempted Criminal Possession of Stolen Property, 5th Degree. Sentenced to 1 year probation |
| Unauthorized Use of Vehicle | Arrest 7/05/03, Lynbrook, NY | Convicted of Attempted Criminal Possession of Stolen Property, 5th Degree. Sentenced to 1 year probation |

*(Arrest record should be set out whether convicted or not. If none state none)*

**Subversive activities or affiliations in the U.S.:** Member of MS-13 Street Gang

**Other Factors:** Subject is cooperating with ICE SAC/NY in this investigation and has expressed his intent to continue that cooperation. GOMEZ has followed specific instructions set forth by ICE Special Agents Keegan and Martinez and his cooperation has proven to be extremely valuable. In addition, GOMEZ is in daily contact with either Agent Keegan or Martinez. Jack Smith, Assistant United States Attorney for the Eastern District of New York, was consulted regarding this request and has no objection to the granting of Deferred Initiation of Removal Proceedings to Amilcar GOMEZ. Susan Egan, Assistant District Counsel for New York City, was also consulted regarding this request and the Office of District Counsel has no objection to this request or the granting of Deferred Initiation of Removal Proceedings to Amilcar GOMEZ either.

Deferred Initiation of Removal Proceedings Request for Amilcar GOMEZ, A# 94 474 602
Page3


Therefore, in support of this criminal investigation, it is requested Amilcar GOMEZ be granted
Deferred Initiation of Removal Proceedings pursuant to the Immigration and Nationality Act for one
year as an act of convenience to the government. During this period ICE Special Agents Erin
Keegan and Celestino Martinez will be the control agents for Amilcar GOMEZ.

Deferred Action **Recommended** / Not Recommended

_____  Date __11/7/05__
Mona B. Forman, Assistant Special Agent in Charge, New York


Deferred Action **Approved** / **Not Approved**

_____  Date __11/9/05__
Martin D. Ficke, Special Agent in Charge, New York

**U.S. Citizenship
and Immigration
Services**

Search    [Search]

FORMS        NEWS        RESOURCES        LAWS        OUTREACH        ABOUT US

- Check My Case Status
- Sign-in to My Account
- Sign-up for Case Updates
- Check Processing Times
- Change Of Address Online
- e-Request
- Office Locator

## My Case Status

Para tener acceso a este sitio en Español, presione aquí

> **Your Current Case Status for Form I765, APPLICATION FOR EMPLOYMENT AUTHORIZATION**

Enter your receipt number

EAC0515570567

[Check Status]

    

Acceptance   Initial Review   Decision   Post Decision Activity   Card/ Document Production

Your Case Status:

Decision

**Decision**

On November 28, 2005, we mailed you a denial decision notice for this case I765 APPLICATION FOR EMPLOYMENT AUTHORIZATION. The notice explains why the denial decision was made and the options that may be available to you. If you have not received this notice within 15 days of November 28, 2005, please call customer service at 1-800-375-5283 for further assistance.

During this step the formal decision (approved/denied) is written and the decision notice is mailed and/or emailed to the applicant/petitioner. You can use our current processing time to gauge when you can expect to receive a final decision.

You can register for automatic case status updates by email and text message by creating an account.
To submit a service request for an inquiry for an application please click e-Request.

> **Processing Times**

1). Select a form type

Select one...                        ▼

[Next]   [Reset]

View national volumes and trends for all applications

**USCIS Privacy Act Statement**

**Case Status Online**

**Authority:** The information requested by My Case Status is collected pursuant to the Immigration and Nationality Act of 1952, Public Law 82-414, as amended.

**Purpose:** The primary purpose for collecting your case receipt number is to provide you with a status update and estimated processing times for a pending immigration benefit application or petition.

**Routine Uses:** The information may be used by and disclosed to DHS personnel and contractors or other agents who need the information to assist in activities related to providing status information on a pending immigration benefit application or petition. Additionally, DHS may share the information with law enforcement or other government agencies as necessary to respond to potential or actual threats to national security pursuant to the agency's published Privacy Policy and the routine uses outlined in the Benefits Information System system of records notice, DHS-USCIS-007, September 29, 2008 73 FR 56596.

**Disclosure:** The information you provide is voluntary. However, failure to provide the requested information may prevent USCIS from providing a status update on your pending case.

OMB control no. 1615-0080

Expiration date 6-30-2012

# Exhibit K

REQUESTED BY:  KEEGAN, ERIN
O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N | 1. TECS ACCESS CODE 3 |
|---|---|
| | 2. PAGE    1 |
| | 3. CASE NUMBER ▓▓▓▓▓ |

4. TITLE: OPERATION COMMUNITY SHIELD/ MS-13 GANG (NYC/WESTCHESTER)

5. CASE STATUS:     INTERIM RPT

| 6. REPORT DATE<br>062905 | 7. DATE ASSIGNED<br>102704 | 8. CLASS<br>I | 9. PROGRAM CODE<br>7EB | 10. REPORT NO.<br>069 |
|---|---|---|---|---|

11. RELATED CASE NUMBERS:

12. COLLATERAL REQ:

13. TYPE OF REPORT:
   INVESTIGATIVE FINDINGS

TOPIC: JUNE 21 2005 - MEETING WITH GOMEZ 2ND DAY OF GED TEST

14. SYNOPSIS:

June 21, 2005  Meeting with Amilcar GOMEZ a/k/a "Goofy"
             2nd Day of GED Test

| 15. DISTRIBUTION:<br>SACNY | 16. SIGNATURE:<br>MARTINEZ     CELESTINO     SPECIAL AGENT |
|---|---|
| | 17. APPROVED:<br>LOVE               JOSEPH       CI GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: NY<br>NEW YORK, NY - SAC | 19. TELEPHONE: ▓▓▓▓▓ |
| | 20. TYPIST: MARTINEZ |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

REQUESTED BY: KEEGAN, ERIN
O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N | 1. TECS ACCESS CODE 3 |
|---|---|
| | 2. PAGE   1 |
| | 3. CASE NUMBER ████████ |

4. TITLE: OPERATION COMMUNITY SHIELD/ MS-13 GANG (NYC/WESTCHESTER)

5. CASE STATUS:   INTERIM RPT

| 6. REPORT DATE<br>062905 | 7. DATE ASSIGNED<br>102704 | 8. CLASS<br>I | 9. PROGRAM CODE<br>7EB | 10. REPORT NO.<br>068 |
|---|---|---|---|---|

11. RELATED CASE NUMBERS:

12. COLLATERAL REQ:

13. TYPE OF REPORT:
    INVESTIGATIVE FINDINGS

TOPIC: JUNE 20 2005 MEETING WITH GOMEZ - 1ST DAY GED TEST

14. SYNOPSIS:

June 20, 2005  Meet with Amilcar GOMEZ a/k/a "Goofy

DETAILS OF INVESTIGATION

| 15. DISTRIBUTION:<br>SACNY | 16. SIGNATURE:<br>MARTINEZ       CELESTINO       SPECIAL AGENT |
|---|---|
| | 17. APPROVED:<br>LOVE       JOSEPH       OI/ GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: NY<br>NEW YORK, NY - SAC | 19. TELEPHONE: ████████ |
| | 20. TYPIST: MARTINEZ |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

000000034

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY | 1.  PAGE    2 |
| ICE | |
| R E P O R T   O F   I N V E S T I G A T I O N | 2.  CASE NUMBER |
| C O N T I N U A T I O N | 3.  REPORT NUMBER: 068 |

On Monday, June 20, 2005, at approximately 1201 hours, ICE Special Agent Celestino J. Martinez contacted Amilcar GOMEZ a/k/a "Goofy" regarding meeting with him at 1545 hours at 351 West 18th Street, New York, New York prior to taking his GED Test.

GOMEZ stated that he does not know if "Conejo" is in New York. In addition, GOMEZ stated that he has not received any recent calls from "Homie" or his brother, Felipe GOMEZ a/k/a "Snoopy".

At approximately 1545 hours, ICE Special Agents Celestino J. Martinez and Erin Keegan met with "Goofy" at 18th Street and 8th Avenue in New York City, New York.

ICE SA Martinez provided GOMEZ with his EL Salvadoran passport, Social Security card, and School I.D. card so that he would have photo identification to take his Session I part of his General Equivalency Diploma Test at the High School for Humanities located in Manhattan, New York.

GOMEZ informed SA Martinez that Session 2 of the test would be conducted on Tuesday, June 21, 2005, at 1615 hours, at the High School for Humanities.

GOMEZ again reiterated that he doesn't know if "Conejo" came to New York and that "Homie" and his brother, Felipe GOMEZ a/k/a "Snoopy" have not called him as well.

However, GOMEZ added that he did speak with his brother, Felipe GOMEZ a/k/a "Snoopy" on Saturday, June 18, 2005, and was told that "Homie" did not have anything to add about "Conejo" to "Snoopy".

At approximately 2030 hours, ICE S/A Martinez observed GOMEZ with an Unidentified Male (UIM) outside the entrance for the High School for the Humanities.

At approximately 2035 hours, S/A Martinez observed the UIM and GOMEZ part ways.

At approximately 2040 hours, S/A Martinez met with GOMEZ on 18th Street between 8&9th Avenues in Manhattan, New York. GOMEZ identified the UIM as "Lagrima" from the Freeport Locos Salvatruchas MS-13 Clique, located in Long Island, New York. GOMEZ stated that "Lagrima" informed him that he was also there to take the GED test. GOMEZ stated that "Lagrima" asked for his phone number and he provided it to him.

GOMEZ requested to meet with AUSA Jack Smith.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

# Exhibit L

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
UNITED STATES OF AMERICA,

                                  06-CR-613

        -against-                **AFFIRMATION**


AMILCAR GOMEZ,

              Defendant.

-------------------------------------------------X

SCOTT YALE AUSTER, being first duly sworn, deposes and states as follows:

1. I am an attorney duly admitted to practice law in the Eastern District of New York. I was counsel to Amilcar Gomez in the matter of <u>United States v. Amilcar Gomez</u>, Criminal Docket No.: 06 CR 613 (S-2) (SJ), during his trial conducted on the days of March 30, 2009, March 31, 2009, April 1, 2009, April 2, 2009, and April 3, 2009.

2. After the Government rested its case, Mr. Gomez did express to me his desire to testify.

3. The Court proceeded directly to summations after the Government rested and after my Rule 29 motion.

4. I never placed on the record Mr. Gomez's desire to testify, nor did I tell Mr. Gomez that the decision to testify was his alone to make.

5. Mr. Gomez did relate to me that he never formulated the intent to commit the crimes of violence charged in the Indictment.

6. After the Government rested, the Court never made inquiry of me as to whether the defense rested.

7. Mr. Gomez was not afforded his right to testify.

I, Scott Yale Auster, this 22nd day of February, 2011, hereby swear and affirm under the penalties of perjury that the foregoing Affirmation is true and correct and based upon my personal knowledge.

Scott Yale Auster

# Exhibit M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - X
UNITED STATES OF AMERICA,                  : 06-CR-0613 (S-2) (SJ)
                                           :
                                           :
-against-                                  :
                                           : United States Courthouse
                                           : Brooklyn, New York
                                           :
                                           :
AMILCAR GOMEZ,                             : March 30, 2009
                Defendant.                 : 9:30 a.m.
- - - - - - - - - - - - - X


CRIMINAL CAUSE FOR JURY SELECTION AND TRIAL
BEFORE THE HONORABLE STERLING JOHNSON
UNITED STATES DISTRICT COURT JUDGE, AND A JURY

                        - - -

                A P P E A R A N C E S:

For the Government:            United States Attorneys Office
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York   11201
                              BY:   JASON JONES, ESQ.
                              BY:   CARTER BURWELL, ESQ.


For the Defendant:            Law Office of Scott Auster, Esq,
                              65 Highview Drive
                              Carmel, NY 10512
                              BY:   SCOTT AUSTER, ESQ.




Court Reporter:               Nicole M. Warren, CSR, RMR, CRR
                              Official Court Reporter

Proceedings recorded by computerized stenography
Transcript produced by Computer-aided Transcription.

USA V. GOMEZ

1    (In open court; all parties present.)

2    COURTROOM DEPUTY:  USA versus Amilcar Gomez.

3    MR. JONES:  Good morning, your Honor.

4    Jason Jones for the Government.

5    THE COURT:  Good morning.

6    MR. AUSTER:  Good morning, your Honor.

7    Scott Auster on behalf of the defendant.  I believe

8    he's being brought out.

9    THE COURT:  Does he have civilian clothes?

10    MR. AUSTER:  I hope so.

11    (Defendant Gomez enters the courtroom.)

12    MR. AUSTER:  Yes.

13    THE COURT:  Okay.  I have a witness list.  Do I have a

14    copy of the redacted version?

15    THE DEFENDANT:  (Raises hand.)  I would like to speak

16    to the judge.

17    THE COURT:  Are we ready for the jury?

18    MR. JONES:  Just one scheduling matter that Mr. Auster

19    and I have discussed.

20    MR. AUSTER:  Your Honor, my client wishes to say

21    something.  I don't know what he wants to say.  Can I have a

22    moment to find out what it is before he speaks to the Court?

23    THE COURT:  Yeah.

24    (Discussion between Mr. Auster and the defendant; off

25    the record.)

Nicole M. Warren, CSR, RMR, CRR

1    MR. AUSTER:  Your Honor, apparently he -- Mr. Gomez

2  believes that we're not ready for trial, that he wants an

3  opportunity to speak to two additional witnesses on his behalf.

4    THE COURT:  Okay.  The application's denied.  We're

5  going to trial.

6    Now, who are those people in the rear?

7    MR. AUSTER:  Those, I believe, are some of my client's

8  family.  I will speak to them and advise them that they should

9  leave during the course of jury selection.

10    THE COURT:  Well, what I want them to do, because I'm

11  going to need those seats for the jurors who are going to come

12  up, we're going to select the jurors.  So, we'll ask them to

13  step out and then we'll select the jurors and then they can

14  come back in.

15    MR. AUSTER:  Okay.

16    THE COURT:  Okay?

17    MR. AUSTER:  Yeah.  Now -- I meant "yes," your Honor.

18    The issue that Mr. Jones was referring to, your Honor.

19    THE COURT:  What was the issue?

20    MR. AUSTER:  Just a scheduling matter with regard to

21  today, your Honor.

22    Over the course of this past weekend there was a

23  tragedy in my family.  My father-in-law was brought to the

24  hospital with congestive heart failure.  He's still at the ICU

25  unit at the local hospital.

1           Because of that, that impacted greatly on my ability

2    to prepare for today's proceedings and the trial in general.

3           I've spoken with Mr. Jones about it, and I told him

4    that I was going to petition the Court to adjourn the matter

5    after the jury selection today so that I could try to recoup

6    some of the time that I lost at the hospital this past weekend.

7           However, it appears that Mr. Jones has certain

8    witnesses that are here for today only; and the potential is

9    that he will not be able to get them back in.

10          So, what I'm asking for the Court with that brief

11   background is that after the completion -- and we've discussed.

12   There are four witnesses.  If the Court would be amenable to

13   adjourning the proceedings today after the completion of those

14   four witnesses, that would be --

15          THE COURT:  That will be no problem.

16          Are they long witnesses?

17          MR. JONES:  No, your Honor.  They're civilians, some

18   from upstate, one from out of state who are, I think,

19   understandably who are very afraid, very hesitant to be here.

20   They were escorted by agents.  So, 15 minutes, 20 minutes, very

21   short.

22          THE COURT:  No problem.

23          MR. AUSTER:  I appreciate that, your Honor.

24          THE COURT:  So, you'll have the family step out when

25   the jury comes in 'cause we're going to need those seats.  Then

USA V. GOMEZ

when the jury's selected, they can come back in.

      MR. AUSTER:  Okay.

      THE COURT:  Okay.

      MR. JONES:  Your Honor, just one other, I guess, issue on witnesses being in the courtroom.  One of the witnesses who will testify in these proceedings is Special Agent Erin Keegan. She would like to see some of the rest of the trial from the gallery if your Honor's amenable to that.  Obviously, there's one other witness who will testify about statements the defendant made.  She will not be present for that testimony, but I raise it just to request your Honor on her behalf that she be allowed to observe.

      MR. AUSTER:  Is the request for after she's testified?

      MR. JONES:  Prior to testifying but not -- not sitting through any witness testimony that will testify about the same thing she's going to testify about.

      MR. AUSTER:  I'll rely on Mr. Jones' honesty, your Honor.  If he represents that she won't be here during any potential conflict, I have no issues.

      THE COURT:  Okay.

      MR. JONES:  She won't be here.

      THE COURT:  All right.

      MR. JONES:  Thank you, your Honor.

All right.  We'll bring up the jury.

      MR. AUSTER:  I'll go speak to the family, your Honor.

Nicole M. Warren, CSR, RMR, CRR

USA V. GOMEZ

6

(Brief pause.)

MR. AUSTER:  Your Honor, approximately two hours for the selection of the jury, do you think?

THE COURT:  Yeah, we'll -- it's not going to be long. I work pretty fast.

MR. AUSTER:  I know that.  You have that reputation, your Honor.

The point is I thought that after jury selection they would probably take them down and show them the room, and then we would come back.

THE COURT:  Take them down where?  It's right here on this floor.

MR. AUSTER:  Okay.  If I tell them two hours, is that reasonable?

THE COURT:  Tell who?

MR. AUSTER:  The family to come back in two hours.

THE COURT:  Oh, yeah.  Yeah.

(Brief pause.)

MR. JONES:  Your Honor, one thing before openings.  We submitted a letter back in December -- and I know your Honor's aware of this record as is defense counsel but just so the record is clear -- perhaps the most important issue in this case is going to end up being whether or not the defense breaches the proffer agreement in which case a whole slew of statements are going to come in that the defendant made to

Nicole M. Warren, CSR, RMR, CRR

DIRECT EXAMINATION OF D. SERRANO - BY MR. JONES

1   Q.  Well, how do you know there was a fight?

2   A.  Well, 'cause that's what I recall.  We saw him, but, I

3   mean ...

4   Q.  Describe what you saw.

5   A.  That he was hitting somebody on the floor, kicking somebody

6   on the floor.

7   Q.  Okay.  Was the person on the floor, can you describe who he

8   was kicking and punching?

9   A.  He was kicking somebody.  I didn't see who, the person's

10  face.

11  Q.  Was he alone when he was doing that?

12  A   No.  There was like two other people.

13  Q.  Who else?

14  A.  Well, I remember "Vietnam"; and then I don't remember who

15  the other person was.

16  Q.  You don't know who the third person was.

17  A.  No.

18  Q.  Okay.  What were the other people doing?  What was

19  "Vietnam" doing?

20  A.  Kicking him.

21  Q.  What happened next?

22  A.  We ended up leaving.  We walked out of the hill.  We got on

23  the J train, and we went to this abandoned area and 121 Street.

24  Q.  Did you end up seeing -- after you left the fight, did you

25  end up seeing any of those gang members again later that night?

CROSS-EXAMINATION OF D. SERRANO - BY MR. AUSTER

1  A.  Yes.

2  Q.  And do you recall ever describing the individual on the

3  ground at that time?

4  A.  I don't remember.

5  Q.  Do you recall indicating that they were kicking a heavyset

6  male Hispanic, 17 years?

7  A.  That's -- I mean, whatever I said then was whatever I

8  remembered at that time.  It's been too many years now for me

9  to remember.

10  Q.  But you don't remember now.

11  A.  No.

12  Q.  So, would that description be accurate?

13  A.  If that's what I said in the statement, that's what it was.

14  Q.  And did there -- of the three people that was standing

15  there, beating this individual, you recognized "Peseta"?

16  A  Yes.

17  Q.  And you recognized "Psycho"?

18  A  He wasn't with "Peseta," beating nobody.

19  Q.  Who was the other person who was beating him?

20  A.  "Vietnam."

21  Q.  "Vietnam."

22  A.  Yeah.

23  Q.  And the third person you don't recognize.

24  A.  No.

25  Q.  Did you see anybody else around that individual laying on

Nicole M. Warren, CSR, RMR, CRR

CROSS-EXAMINATION OF J. ORELLANA - BY MR. AUSTER

1    Q.  Yeah.

2    A.  He was probably, like, a block, two blocks away from the

3    junior high school.

4    Q.  And where were you when you first saw him doing this?

5    A.  Where was I?  I was at the corner of the street.

6    Q.  About how far away from him were you?

7    A.  Probably about a block.

8    Q.  And you were able to recognize him from the block away.

9    A.  Yes.

10   Q.  And you saw three people including "Peseta" beating up on

11   someone; is that accurate?

12   A.  Yes.

13   Q.  And you approached him, and they were still beating the

14   person.

15   A.  Yeah, they were kicking the person.

16   Q.  And you were focusing on what was going on, were you not?

17   A.  Yeah, I was focused on my husband, what was he doing.

18   Q   And the other two individuals who were there, they were --

19   A.  They were just kicking the person on the floor.

20   Q.  Did you see any knives?

21   A.  No, not there.

22   Q.  Did you see any baseball bat?

23   A.  No.

24   Q.  Now, you were a full block away from them when you first

25   recognized they were involved in this fight; and then you

Nicole M. Warren, CSR, RMR, CRR

# Exhibit N

AFFIDAVIT

I, ADRIAN SORIANO, residing AT The
Clinton Correctionel Facility in New York, being
duly sworn depose and say The Following:

1. I Am currently serving A sentence oF 23
years AFTER pleading Guilty to Manslaughter
in The stabbing Death of Pedro Martinez.

2. On March 1, 2003 I was involved in
a Fight with Pedro Martinez which
resulted in his death.

3. Amilcar Gomez HAS nothing to do with
Pedro Martinez's death. He did not
Aid or assist me in Any way or
assist in causing the death of Pedro
Martinez.

4. Amilcar Gomez was not aware That I
had a knife or stabbed Pedro Martinez.

5. Amilcar Gomez was drunk on The night
in Question. Amilcar Gomez did not
possess a gun or knife on the
night in Question.

6. Amilcar Gomez's Attorney was informed
That I wanted to testify And wanted
to explain to him That Amilcar was
not involved But He Never interviewed

The Attorney of Amilcar Never called me to testify or explain to the Judge what really Happened.

7. I Desired to testify for Amilcar But his lawyer never Reached out to me.

8. I Fought and caused the death of Pedro Martinez and Amilcar had nothing to do with this crime. He is innocent of the charges of murder.

9. The State court dismissed all the charges against Amilcar But His Lawyer never investigated Any of there important facts.

ADRIAN SORIANO

Sworn to before me this 27th day of July 2013

Notary Public

EDWARD IRIZARRY
Notary Public, State of New York
No. 02IR5069315
Qualified in New York County
Commission Expires November 25, 2014

# Exhibit O

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - X
UNITED STATES OF AMERICA,          : 06-CR-0613 (S-2) (SJ)
                                   :
                                   :
-against-                          : United States Courthouse
                                   : Brooklyn, New York
                                   :
                                   :
AMILCAR GOMEZ,                     : April 1, 2009
               Defendant.          : 9:30 a.m.
- - - - - - - - - - - - - X
```

```
                      CRIMINAL CAUSE FOR TRIAL
             BEFORE THE HONORABLE STERLING JOHNSON
          UNITED STATES DISTRICT COURT JUDGE, AND A JURY

                             - - -

                       A P P E A R A N C E S:

For the Government:            United States Attorneys Office
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York  11201
                              BY:   JASON JONES, ESQ.
                              BY:   CARTER BURWELL, ESQ.


For the Defendant:            Law Office of Scott Auster, Esq,
                              65 Highview Drive
                              Carmel, NY 10512
                              BY:   SCOTT AUSTER, ESQ.




Court Reporter:               Nicole M. Warren, CSR, RMR, CRR
                              Official Court Reporter

Proceedings recorded by computerized stenography
Transcript produced by Computer-aided Transcription.
```

Nicole M. Warren, CSR, RMR, CRR

W. VINDELL-BETANCO - DIRECT BY MR. BURWELL

1  Q.  Did the defendant tell you anything after you saw "Static"?

2  A.  Yes.

3  Q.  What did he tell you?

4          MR. AUSTER:  Objection.

5          THE COURT:  I'll allow it.

6          THE WITNESS:  He told us that we should get ready

7  because perhaps we would have to beat him up.

8  BY MR. BURWELL:

9  Q.  Did he tell you anything else?

10  A.  He told me to call "Payaso."

11  Q.  Who is "Payaso"?

12  A.  "Payaso" is actually my cousin.

13  Q.  Was he also affiliated with the gang?

14  A.  He was a "primo" at that time.

15  Q.  What did you do next?

16  A.  I called "Payaso" and told him to come over.

17  Q.  Did you tell him anything else?

18  A.  Yes.

19  Q.  What did you tell "Payaso"?

20  A.  I told him to bring the gun.

21  Q.  What gun?

22  A.  A gun that "Payaso" had.

23  Q.  Where did "Payaso" get the gun from?

24          MR. AUSTER:  Objection.

25          THE COURT:  If he knows.

W. VINDELL-BETANCO - DIRECT BY MR. BURWELL

```
 1              Do you know where "Payaso" got the gun?

 2              THE WITNESS:  The gun belonged to "Chofre."

 3   BY MR. BURWELL:

 4   Q.  Who's "Chofre"?

 5   A.  He was another "primo" at the time.

 6              MR. BURWELL:  Your Honor, may I approach?

 7              THE COURT:  Go ahead.

 8   BY MR. BURWELL:

 9   Q.  Handing you what has been marked Government's Exhibits 6,

10   9, 10, and 7, I ask you to take a look at these and tell us if

11   you identify anyone.

12   A.  Okay.  This is "Goofy."

13   Q.  And can you turn it on the back and tell us what exhibit

14   number it is?

15   A.  No. 6.

16              This is "Payaso," No. 9.

17              This is "Chofre," No. 10.

18              And this is me, No. 7.

19              MR. BURWELL:  Your Honor, I ask that these be admitted

20   into evidence.

21              THE COURT:  Mr. Auster?

22              MR. AUSTER:  I'm just trying to do my paperwork and

23   catching up.  Sorry.  Yes, your Honor, no -- I consent.

24              THE COURT:  Received.

25              (Government Exhibits 6, 7, 9, and 10 received in
```

W. VINDELL-BETANCO - DIRECT BY MR. BURWELL

1    evidence.)

2    BY MR. BURWELL:

3    Q.  Do I have those names and faces correct up there on the

4    board?

5    A.  Yes.

6    Q.  Do you know "Payaso's" real name?

7    A.  His name is Yasser.

8    Q.  Do you know his last name?

9    A.  Jerez.

10   Q.  What happened after you called "Payaso"?

11   A.  Then we were waiting for him.  Then we went outside.  We

12   had bottles in our hands.  Then we went back inside.  I don't

13   remember what happened.  And we didn't do anything.  Then we

14   left the party; and "Goofy" went to his house, I imagine.

15          MR. AUSTER:  Objection.

16          THE WITNESS:  And I met with my --

17          THE COURT:  Sustained.  You can't imagine.

18          MR. AUSTER:  I ask it be stricken.

19          THE COURT:  It will be stricken.

20   BY MR. BURWELL:

21   Q.  What did you do after you left this party?

22   A.  I met up with "Payaso" and others who were with him.

23   Q.  What did you do next?

24   A.  We then went to look for "Ninja" again.  Then we went back

25   to the party, and we had a confrontation with "Static."

453

W. VINDELL-BETANCO - DIRECT BY MR. BURWELL

1   Q.   Did you have a gun with you?

2   A.   Yes.

3   Q.   Where was the gun?

4   A.   It was in "Payaso's" backpack.

5   Q.   Did you threaten to use it?

6   A.   Yes.

7   Q.   What happened?

8   A.   By then the police was coming, and everybody left the spot.

9   Q.   What happened to the gun, if you know?

10  A.   "Payaso" put it into a refrigerator, and my understanding

11  is that the police took it.

12          MR. AUSTER:  Objection to his understanding.

13          THE COURT:  Sustained.  Sustained.

14  BY MR. BURWELL:

15  Q.   What did "Payaso" do with the gun?

16          MR. AUSTER:  Objection.  That was asked and answered.

17          THE COURT:  Yeah.  Asked and answered.

18  BY MR. BURWELL:

19  Q.   Can you describe the backpack that "Payaso" had?

20  A.   It was a black Northface.

21  Q.   Do you know if there were any items inside the backpack?

22          THE COURT:  Other than the gun?

23  BY MR. BURWELL:

24  Q.   Other than the gun.

25  A.   "Payaso" told me that he had a notebook.

Nicole M. Warren, CSR, RMR, CRR

# Exhibit P



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - X
UNITED STATES OF AMERICA,              : 06-CR-0613 (S-2) (SJ)
                                       :
                                       :
-against-                              : United States Courthouse
                                       : Brooklyn, New York
                                       :
                                       :
AMILCAR GOMEZ,                         : April 3, 2009
                    Defendant.         : 9:30 a.m.
- - - - - - - - - - - - - X

CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE STERLING JOHNSON
UNITED STATES DISTRICT COURT JUDGE, AND A JURY

            - - -

A P P E A R A N C E S:

For the Government:        United States Attorneys Office
                           Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York  11201
                           BY:    JASON JONES, ESQ.
                           BY:    CARTER BURWELL, ESQ.


For the Defendant:         Law Office of Scott Auster, Esq,
                           65 Highview Drive
                           Carmel, NY 10512
                           BY:    SCOTT AUSTER, ESQ.




Court Reporter:            Nicole M. Warren, CSR, RMR, CRR
                           Official Court Reporter


Proceedings recorded by computerized stenography
Transcript produced by Computer-aided Transcription.

Nicole M. Warren, CSR, RMR, CRR

```
 1              (In open court; all parties present.)
 2              THE COURT:  I'm addressing my trial.  Do you see the
 3    note?
 4              MR. JONES:  Yes, your Honor.
 5              THE COURT:  Are you getting that together?
 6              MR. AUSTER:  We're working on it, your Honor.
 7              MR. JONES:  The diagram of the crime scene, we haven't
 8    sent back the binder of those exhibits which I believe we were
 9    going to review the exhibit list and send the whole --
10              THE COURT:  I want you to review it.  Then you'll let
11    me know.
12              MR. JONES:  Then we'll have all of that and we won't
13    need to -- there's the blowup.
14              THE COURT:  That's 215?
15              MR. BURWELL:  215 and 215A.
16              MR. JONES:  Is there a Court Exhibit 7?
17              MR. AUSTER:  We went from 6 to 8.
18              COURTROOM DEPUTY:  There was the witness list that we
19    sent back that you provided.
20              THE COURT:  When you get it together, let me know.
21    Then I'll have to bring the jury in and read these notes into
22    the record. If you have any problems or disagreements, I will
23    resolve whatever disagreements you have.
24              MR. JONES:  Yes, your Honor.
25              (Off the record.)
```

1          (On the record.)

2          MR. AUSTER:  I think we should tell them to discount

3  the caption.

4          MR. JONES:  The caption isn't what should be

5  controlling.  What should be controlling is the law as you gave

6  it.

7          THE COURT:  Disregard the caption.

8          MR. AUSTER:  I would rather not but --

9          MR. JONES:  The title headings aren't the law.  You

10  told them what the law is.

11          MR. AUSTER:  Why don't you tell them that the caption

12  title headings are not the law?

13          THE COURT:  I'm bringing them in and then what I'll do

14  is I'll read these -- read these notes that they've sent in,

15  four notes so far.

16          MR. JONES:  I think we're still working on what to

17  pull for the notes about the confessions by the defendant and

18  by the cooperators.  My concern on that is, I mean, it's almost

19  like reading tea leaves with these notes; but what they're

20  asking for, I think, is the agent's reports of all of that.

21  They can't have any of that, obviously.  We referred to them,

22  especially defense counsel in cross.  He showed a report.

23          I think that's what they're asking for.  It may be

24  helpful to tell them they can't have the reports.  They can

25  have the testimony.  If they want the testimony from a

Nicole M. Warren, CSR, RMR, CRR

1    cooperator, about what topic?

2            THE COURT:  I'll bring them in anyway.

3            (Brief pause.)

4            (The jury enters the courtroom.)

5            THE COURT:  All right.  Have a seat, ladies and

6    gentlemen.

7            I brought you in here because I have these four notes

8    that you have given me this morning.  I have to read them into

9    the record.  I want to clarify a couple of things with you.

10           First of all, the Court has received what has been

11   marked as Court's Exhibit No. 3, a note that says:

12           The jury's fully present and would like the requested

13   materials; i.e., the list of people testifying as well as the

14   three charges.

15           The three charges being the indictment, I assume.

16           THE FOREPERSON:  Yes.

17           THE COURT:  That list has been provided to you.  If it

18   has not, let me know.

19           Another note marked Court's Exhibit 2, it says:

20           The English version of Mr. Gomez's

21   confession/statement of crimes he committed as discussed with

22   Agent Keegan.

23           And it's signed by the foreperson.

24           THE FOREPERSON:  Yes.

25           THE COURT:  Also, the confession/statement made by

1   "Nica" and "Peseta" to the Federal agents.

2           How many Federal agents were there?

3           MR. JONES:  There was a Federal agent and a Federal

4   prosecutor.

5           THE COURT:  We'll get those for you.

6           Court's Exhibit No. 7 are the materials that were sent

7   back to you.

8           Court's Exhibit No. 8 reads:

9           The transcript of conversation about "Goofy's" request

10  to bring the gun to the party; street diagram of the crime

11  scene.

12          Signed by the foreperson.

13          You're working on that?

14          MR. JONES:  I believe we're going to check the exhibit

15  list.  I think that shouldn't take long too do.

16          THE COURT:  You're not talking about the 3500

17  material, are you?

18          MR. JONES:  No.

19          THE COURT:  All right.  That will go in there.

20          Then we have Court's Exhibit 9.  It says:

21          "Question:  In Court's Exhibit No. 2" -- I assume that

22  that is the verdict sheet.

23          THE FOREPERSON:  The indictment, two pages, the

24  two-page document.

25          THE COURT:  That's the verdict sheet.

```
 1              Count Two is entitled "Count Two:  Firearm
 2     possession."  In your jury charge, page 59, it is stated as
 3     Count Two:  Use of a firearm.  Is this difference significant?
 4              Disregard the captions.  The only thing that concerns
 5     you is the body.
 6              MR. JONES:  Did your Honor want to address the issue
 7     of the report versus the transcript?
 8              THE COURT:  I understand that some of the information
 9     that you have requested is not really testimony about the
10     subject that you would like.  Agents or witnesses testified
11     with respect to a report that was being read.  Now, the report
12     is not evidence.  So, we can't sent that back to you.  The
13     testimony is evidence, and you can get that.
14              MR. JONES:  I think the only question would be, for
15     example, on statements by people made to agents, if we can be
16     specific as to that testimony about what topics so that we can
17     more easily discern --
18              THE COURT:  Can you send me a note as to what topics
19     by what person and what subject matter?  Then we can zero in on
20     it.  It will make it much easier.  Okay.  Thank you.
21              (The jury leaves the courtroom and continues
22     deliberations.)
23
24
25
```

1          (In open court; all parties present.)

2          THE COURT:  I received this before.  I haven't read it

3    in evidence, have I?

4          COURTROOM DEPUTY:  No.

5          (Brief pause.)

6          (Defendant Amilcar Gomez enters the courtroom.)

7          THE COURT:  Okay.  What is the dispute?

8          MR. JONES:  I think with regard to the request for the

9    statements, I think your Honor requested they clarify it.  I

10   think that's done.

11         Exhibit 8, Part Two we've already done, the diagram.

12         Part One, it asks for the transcript of the

13   conversation about "Goofy"'s request to bring the gun to the

14   party.  That has now been added to Court Exhibit 10 where they

15   ask for additional testimony regarding the lost gun after that

16   party.

17         I think we're in agreement on the pages of the

18   transcript that address that.

19         MR. AUSTER:  Just let me with regard to --

20         MR. JONES:  Eight and ten.

21         MR. AUSTER:  "Goofy."

22         MR. JONES:  I believe it's page 450, line 1 through

23   page 451, line 2.

24         MR. AUSTER:  I thought it was 450, line 9.  Okay.

25   Starting line, it doesn't matter.  We can start at line 1.

1          MR. JONES:  Through 451, line 4.

2          MR. AUSTER:  Line 5 'cause 4 is the question.

3          MR. JONES:  Line 5.  Then 452, starting at line 21

4    through 455, stopping at line 3.  There's some colloquy and

5    redactions.

6          THE COURT:  What's going to happen is I'm just going

7    to give them the testimony.  Any extraneous matters such as

8    objections or sidebars, we black those out.  I then xerox it,

9    and I'm going to send that in to them.

10          MR. AUSTER:  Oh, okay.

11          MR. JONES:  Then Mr. Auster addressed this on cross as

12   well.  I believe that starts at page 500, line 21 through page

13   503, line 16.

14          THE COURT:  What's the dispute?

15          MR. JONES:  I think on that we're basically in

16   agreement.

17          MR. AUSTER:  Actually, I don't know that this section

18   answers it; but I have no problem putting it in there, if the

19   Government thinks it's an appropriate answer.

20          MR. JONES:  So, I think we've settled those issues.

21          Then there is I think we agree on note -- Court

22   Exhibit 10, they also want testimony of the Lynbrook Police

23   Officer.  I believe we agreed that that is page 336, line 17

24   through page 338, line 23.

25          MR. AUSTER:  Yeah.

Nicole M. Warren, CSR, RMR, CRR

1          MR. JONES:  I believe that that from the Government's

2   perspective answers all the letters; and if they want anything

3   else after your Honor's admonition earlier, they can request

4   that.

5          MR. AUSTER:  I think that's the dispute, your Honor.

6   I don't think that 10 clarifies 6.  So, I would ask the Court

7   if that answers all they want or do they still want what we've

8   marked Court Exhibit No. 6 responding.

9          THE COURT:  What is Court's Exhibit 6?

10         MR. JONES:  Court Exhibit 6 is asking for these

11  confessions and statements.  You explained to the jury they

12  can't have those.  If they want something more, be more

13  specific and let us know specifically what testimony they want.

14         It's the Government's position you respond to their

15  note by saying, "You can't have the reports.  If you want

16  something more specific, ask for it."

17         I think that answers their question.

18         THE COURT:  When I call them back in to read this, I

19  will ask them are they satisfied with the responses that we've

20  given them.  If you need anything else, just let me know.

21         MR. AUSTER:  I would just ask the Court in making that

22  statement that the Court emphasize that our responses now are

23  all inclusive of all the things they've asked for so that they

24  understand that they're not sitting around waiting for 6 to get

25  answered.

Nicole M. Warren, CSR, RMR, CRR

1          THE COURT:  Okay.

2          MR. JONES:  That's fine.

3          THE COURT:  All right.  You don't want me to bring

4    them in now, do you?

5          MR. AUSTER:  Your call.

6          THE COURT:  We'll bring them in, huh?

7          MR. AUSTER:  Are you going to allow them to deliberate

8    during lunch or ask them to stop?

9          THE COURT:  They will deliberate during lunch.

10         Is their lunch in there?

11         COURTROOM DEPUTY:  I'm going to get it now.

12         THE COURT:  Get them now.  I'll tell them that they'll

13   deliberate during lunch.

14         What I'll do is to tell them any other notes they can

15   send to me but I'll give you guys a chance to eat and it won't

16   be answered until 1:30.

17         MR. AUSTER:  Thank you.  I appreciate that, your

18   Honor.

19         MR. JONES:  Yes, your Honor.

20         THE COURT:  Give me No. 6.

21         (The jury enters the courtroom.)

22         THE COURT:  All right.  Be seated, ladies and

23   gentlemen.

24         I just wanted to let you know that you're going to be

25   getting lunch.  You'll deliberate through lunch.  I'm going to

789

1    allow the lawyers to get lunch.  So, if you have any notes, you

2    can send them to me; but they won't be answered until after

3    1:30 when the lawyers get back.

4           Second of all, I've got to read this last letter into

5    the record.

6           The Court's received another note from the jury marked

7    Court's Exhibit No. 10.  It reads as follows:

8           Testimony of Lynbrook NY Police Officer starting at

9    the point of the car crash.

10          Signed by the foreman.

11          And also "Nica's" testimony relating to the lost gun

12   after the party.

13          Signed by the foreman.

14          Now, I go back to your note No. 6 where it says the

15   English version of Mr. Gomez's confession/statement of crime he

16   committed as discussed with Agent Keegan and also the

17   confession/statement made by "Nica" and "Peseta" as made to the

18   Federal agents.

19          I explained to you that there is testimony by an agent

20   on this subject that you can get; but when they refer to any

21   documents that are not in evidence, you can't get that.

22          Now, is that everything that --

23          THE FOREPERSON:  Well, I believe we withdrew that

24   second one.

25          THE COURT:  Did you?

Nicole M. Warren, CSR, RMR, CRR

# Exhibit Q

COMPLAINT FOLLOW-UP
MEDICAL EXAMINER CASE
PD 313-081-14 (Rev. 10-90)-H1

PAGE 1 OF 1 PAGES

Additional Copies For

| 1 Jurisdiction | 3 | 9 Pct of Report | Aided/Acc. No. | 12 Complaint No. | File No. |
|---|---|---|---|---|---|
| 00 | | 103 | | 1768 | |

| 17 Date of this Report | Day of Week This Report | 31 Date Orig Report | Date Assigned | M.P. Case Number | Unit Reporting |
|---|---|---|---|---|---|
| 03/02/03 | | Mo. Day Yr. | | | MISSING PERSONS SQUAD |

| DETECTIVE ASSIGNED | P.D.S. CASE NO. | M.E. CASE NO. | BOROUGH NO. | ZONE | ZONE NO. |
|---|---|---|---|---|---|
| DET HAMILTON | 376 | 003-962 | 23 | SOUTH | 14 |

| Previous Classification | 45 | 48 | 49 | 50 | 51 | 52 | 61 Rep. Agency Code | Case Status |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | O O | ☐Open ☐Closed |

Classification Changed To  HOMICIDE

Invoice No.

| NAME OF DECEASED (LAST NAME, FIRST, M.I.) | | AGE | RACE | SEX |
|---|---|---|---|---|
| LEASON, EDUARDO          10-24-77 | | 25 | HISP | MALE |

| ADDRESS | APT. NO. |
|---|---|
| 148-14 90 TH AVE | APT 3F |

| DATE OF OCCURRENCE | TIME OF OCC. | DAY OF WEEK | PLACE OF OCCURRENCE |
|---|---|---|---|
| 03/01/03 | SAT | 05:45 | C/O 149th ST AND JAMAICA AVE. |

| EXPIRED AT | DATE | TIME |
|---|---|---|
| MARY IMMACULATE HOSPITAL | 03/01/03 | 07:40 |

| MOS IDENTIFYING | SHIELD | COMMAND |
|---|---|---|
| | | |

| FAMILY MEMBER IDENTIFYING | REALTIONSHIP |
|---|---|
| | |

ADDRESS

| PHOTO/PRINTS | COMMAND |
|---|---|
| DET GRANT | MPS/MELU |

| DOCTOR PERFORMING AUTOPSY | DATE | LOCATION |
|---|---|---|
| | 03/02/03 | QUEENS MEDICAL EXM. OFFICE |

CAUSE OF DEATH

BULLETS RECOVERED DURING AUTOPSY

DESCRIPTION OF CRIME

ABOVE AIDED DECEASED WAS STABBED NUMEROUS TIMES BY THE BELOW PERP FOR

UNKNOWN REASONS.

MEANS EMPLOYED ☐ PHYSICAL FORCE ☐ SHOTGUN ☐ MACHINE GUN ☐ OTHER
☒ KNIFE ☐ BLUNT INSTRUMENT ☐ HANDGUN ☐ RIFLE ☐ STRANGULATION (DESCRIBE)

MOTIVE ☐ ROBBERY ☐ NARCOTICS ☐ DISPUTE ☒ UNK. ☐ OTHER
☐ BURGLARY ☐ SEX CRIME ☐ ORG. CRIME ☐ JUSTIFIABLE (DESCRIBE):

| P E R P S | 1 | ☒ ARRESTED ☐ KNOWN | NAME (LAST, FIRST, M.I.) SORIANO, ADRIAN  M/H  DOB 7-19-82 |
|---|---|---|---|
| | 2 | ☐ ARRESTED ☐ KNOWN | NAME (LAST, FIRST, M.I.) |
| | 3 | ☐ ARRESTED ☐ KNOWN | NAME (LAST, FIRST, M.I.) |

RELATIONSHIP

☐ FRIEND ☐ ACQUAINTANCE ☐ HUSBAND/WIFE ☐ COMMON LAW ☐ STRANGER ☐ BOY/GIRL FRIEND ☐ INTRA-FAMILY ☒ UNKNOWN

CRIMINAL RECORD

Victim:                              Perp(s).:

DETAILS

ABOVE INFO WAS REC"D BY DET MOSCA OF THE 103 PCT SQD.

BODY #      RUN #

| REPORTING | COMMAND | NAME PRINTED | TAX REG. NO. | SUPERVISOR'S SIGNATURE | C.O.'s INITIALS |
|---|---|---|---|---|---|
| | | | | | |

DIST 1 - ARREST & CRIME CODING UNIT   2 - UNIT REFERRED TO   3 - CRIME ANALYSIS UNIT   4 - CHIEF OF DETECTIVES (CIRD)   5 - FILE

**COMPLAINT FOLLOW-UP**
**MEDICAL EXAMINER CASE**
PD 313-081-H (Rev. 10-90)-H1

PAGE 1 OF 1 PAGES

| | Additional Copies For | 1 Jurisdiction | 3 | 9 Pct of Report | Aided/Acc. No. | 12 Complaint No. | File No. |
|---|---|---|---|---|---|---|---|
| | | 00 | | 103 | | 1769 | |

| 17 Date of this Report | Day of Week of This Report | 31 Date Orig Report | Date Assigned | M.P. Case Number | Unit Reporting |
|---|---|---|---|---|---|
| 03/02/03 | SUN | Mo. Day Yr. | | | MISSING PERSONS SQUAD |

| DETECTIVE ASSIGNED | P.O.S. CASE NO. | M.E. CASE NO. | BOROUGH NO. | ZONE | ZONE NO. |
|---|---|---|---|---|---|
| DET HAMILTON | 377 | Q03-960 | 24 | SOUTH | 15 |

Previous Classification

| | 45 | 48 | 49 | 50 | 51 | 52 | 61 Rep. Agency Code | Case Status |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 0 0 | ☐Open ☐Closed |

Classification Changed To **HOMICIDE**

Invoice No.

NAME OF DECEASED (LAST NAME, FIRST, M.I.)

| MARTINEZ, PEDRO          DOB 12-23-69 | AGE 33 | RACE HISP | SEX MALE |
|---|---|---|---|

ADDRESS
148-14  90th AVE

APT. NO. 3F

| DATE OF OCCURRENCE | TIME OF OCC. | DAY OF WEEK | PLACE OF OCCURRENCE |
|---|---|---|---|
| 03/01/03 | 05:45 | SAT | C/O 149th ST AND JAMAICA AVE |

EXPIRED AT
JAMAICA HOSPITAL

| DATE 03/01/03 | TIME 07:40 HOURS |
|---|---|

MOS IDENTIFYING

| SHIELD | COMMAND |
|---|---|

FAMILY MEMBER IDENTIFYING

REALTIONSHIP

ADORESS

PHOTO/PRINTS            DET GRANT

COMMAND  MPS/MELU

| DOCTOR PERFORMING AUTOPSY | DATE 03/02/03 | LOCATION QUEENS MEDICAL EXM OFFICE |
|---|---|---|

CAUSE OF DEATH

BULLETS RECOVERED DURING AUTOPSY

DESCRIPTION OF CRIME

ABOVE DECEASED ALONG WITH HIS BROTHER WERE STABBED NUMEROUS TIMES BY

BELOW PERP FOR UNKNOWN REASONS.

MEANS EMPLOYED ☐ PHYSICAL FORCE  ☐ SHOTGUN  ☐ MACHINE GUN  ☐ OTHER
☒KNIFE  ☐ BLUNT INSTRUMENT  ☐ HANDGUN  ☐ RIFLE  ☐ STRANGULATION (DESCRIBE)

MOTIVE ☐ ROBBERY  ☐ NARCOTICS  ☐ DISPUTE  ☒UNK.  ☐ OTHER
☐ BURGLARY  ☐ SEX CRIME  ☐ ORG. CRIME  ☐ JUSTIFIABLE   (DESCRIBE):

| P E R P S | 1 | ☒ ARRESTED  ☐ KNOWN | NAME (LAST, FIRST, M.I.)  SORIANO, ADRIAN M/H DOB 7-19-03 |
|---|---|---|---|
| | 2 | ☐ ARRESTED  ☐ KNOWN | NAME (LAST, FIRST, M.I.) |
| | 3 | ☐ ARRESTED  ☐ KNOWN | NAME (LAST, FIRST, M.I.) |

RELATIONSHIP

☐ FRIEND  ☐ ACQUAINTANCE  ☐ HUSBAND/WIFE  ☐ COMMON LAW  ☐ STRANGER  ☐ BOY/GIRL FRIEND  ☐ INTRA-FAMILY  ☒☒ UNKNOWN

CRIMINAL RECORD

Victim:                              Perp(s).:

DETAILS

ABOVE INFO WAS RECD BY DET MOSCA OF THE 103 PCT SQD.

BODY #    RUN #

| REPORTING OFFICER'S RANK, SIGNATURE, COMMAND | NAME PRINTED | TAX REG. NO. | SUPERVISOR'S SIGNATURE | C.O.'s INITIALS |
|---|---|---|---|---|
| | | | | |

DIST.: 1 - ARREST & CRIME CODING UNIT   2 - UNIT REFERRED TO   3 - CRIME ANALYSIS UNIT   4 - CHIEF OF DETECTIVES (CIRD)   5 - FILE

# Exhibit R

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,       : 06-CR-0613 (S-2) (SJ)
                                              :

                                              :

-against-                             : United States Courthouse
                                         : Brooklyn, New York

                                              :

AMILCAR GOMEZ,                   : April 2, 2009
              Defendant.    : 9:30 a.m.

- - - - - - - - - - - - X

CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE STERLING JOHNSON
UNITED STATES DISTRICT COURT JUDGE, AND A JURY

- - -

A P P E A R A N C E S :

For the Government:      United States Attorneys Office
                            Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York  11201
                            BY:    JASON JONES, ESQ.
                            BY:    CARTER BURWELL, ESQ.

For the Defendant:       Law Office of Scott Auster, Esq,
                            65 Highview Drive
                            Carmel, NY 10512
                            BY:    SCOTT AUSTER, ESQ.

Court Reporter:          Nicole M. Warren, CSR, RMR, CRR
                            Official Court Reporter

Proceedings recorded by computerized stenography
Transcript produced by Computer-aided Transcription.

Nicole M. Warren, CSR, RMR, CRR

1    statements he made in the meetings with the Government, yes,

2    it's based on Mr. Gomez's statements.

3    BY MR. AUSTER:

4    Q.   Now, as part of those statements in which he describes

5    certain criminal activity that he may or may not have

6    participated in, is part of your responsibility to try to

7    verify or authenticate those allegations?

8    A.   Yes, it is.

9    Q.   And were you able to authenticate any of the ones Mr. Gomez

10   talked to you about?

11   A.   Yes.

12   Q.   Well, for example, were you able to authenticate the

13   incident involving the four Latin Kings members who were

14   outside his house?

15   A.   No, we were not.

16   Q.   And you also mentioned that he said that he was involved in

17   some robberies?

18   A.   Yes.

19   Q.   Were you able to confirm any of those robberies?

20   A.   No.

21   Q.   Now, you also said that he told you in the course of some

22   of these interviews that he was involved in two or three

23   stabbings?

24   A.   Yes.

25   Q.   Were you able to authenticate any of those?

Nicole M. Warren, CSR, RMR, CRR

A.  No.

Q.  So, as you sit here and testify today, you don't really know whether any of those incidents actually happened, do you?

A.  We did not find any reports confirming his statements.

Q.  Is it possible that he told you these incidents so that he would appear more important to you?

MR. BURWELL:  Objection.

THE COURT:  Sustained.

BY MR. AUSTER:

Q.  Did the fact that he was -- gave you the information regarding these other crimes increase your -- I'll withdraw that.

The information that he provided about these other criminal activities, did that information -- it was investigated by your office; is that correct?

A.  Yes.

Q.  And you're required to do that.

A.  Yes.

Q.  And had any of that information turned out to be confirmed, you would have acted on it, would you not?

MR. BURWELL:  Objection.

THE COURT:  Sustained.

BY MR. AUSTER:

Q.  Those letters that we saw yesterday that were translated, those were letters sent to Mr. Gomez, were they not?

Nicole M. Warren, CSR, RMR, CRR

CLOSING STATEMENTS BY MR. AUSTER

1    Now, how can I say that?  I'll tell you why.  This was
2  not one of those incidents where there's a meeting and they go
3  out looking for chavallas.  These were guys coming back from a
4  party, stopped at a store maybe to get beer.  I don't know.
5  That's what they tell us.  I don't know.  But they're walking
6  down the street.  They're not looking for trouble.  Trouble
7  came to them.

8    Trouble came to them in the form of the other gang
9  members that were there that confronted them.  There is no
10  testimony from anyone that Mr. Gomez did anything other than
11  throw a bottle and throw a can, and I submit to you he did that
12  in self-defense.

13    They were the ones who were set on by the other gang.
14  They didn't go out looking for the other gang.  They, by
15  "they," I mean the MS-13 guys.

16    Now, if it had been where they were going out and
17  looking for someone, then you can argue, well, he should
18  reasonably have anticipated that someone would have a weapon;
19  but that wasn't the case here.  This was not a situation where
20  they were looking for someone.  This was a situation where they
21  were coming from a party.  There is no expectation, no
22  reasonable expectation, I would submit to you, by Mr. Gomez
23  that someone would have a weapon on him.

24    So, therefore, ladies and gentlemen, the fact that the
25  incident occurred and someone was killed or two people were

Nicole M. Warren, CSR, RMR, CRR

CLOSING STATEMENTS BY MR. AUSTER

1   were only two or three of those incidents and she also

2   acknowledged that at least two of those incidents, which

3   perhaps is all of the incidents, that he recorded those

4   meetings for them and it was transcribed into a CD and they

5   took it and they used it as part of their investigation.

6           So, if he was looking to violate his agreement, have

7   some ulterior motive, why would he let them know about the

8   meeting?  They didn't have any information about the meeting

9   beforehand.  That's what Agent Keegan told us.

10          I suggest to you it shows his good faith.  So, I'd

11  suggest he was not a leader.

12          Now, the Government also has the gun charge.  He used

13  and carried, transported a weapon, and racketeering for violent

14  a criminal act.  That information comes from Mr. Gomez.  It's

15  uncorroborated in any other manner, just his mouth; and that

16  goes along with the other criminal activity that the agents

17  asked Mr. Gomez about when they interviewed him, the ICE

18  agents.  He told them about robberies that they could not

19  corroborate.  He told them about stabbings that they could not

20  confirm.  He told them about other criminal activity, none of

21  which the Government was able to confirm.

22          This is an individual who as a member of MS-13 gained

23  stature, we have learned, by boasting and doing criminal

24  activity.  We've heard it any number of times from these

25  people.

CLOSING STATEMENTS BY MR. AUSTER

1    That's the mindset that Mr. Gomez has.  If he makes

2    himself more valuable to the Government, he becomes -- it

3    enhances his position with them.

4    None of those incidents could be corroborated because

5    they didn't happen, just as the weapons allegations that

6    they've made didn't happen.  There's no proof of it, and

7    there's ample proof that the individuals of the MS-13 believed

8    that by boasting and in some instances committing criminal acts

9    they gained a reputation.  Neither Mr. "Peseta" could tell you

10   nor Denise nor Jennifer nor at the time Mr. Vindell -- well,

11   we'll take Mr. Vindell out of the mix.  They couldn't

12   indicate -- tell you at any time that they saw a weapon in the

13   hands of Mr. Gomez.

14   In fact, at this hooky party, at that hooky party,

15   they leave when "Static" is there.  The MS-13 members without

16   Mr. Gomez go back.  Mr. Gomez goes somewhere else -- home,

17   anywhere else; but did he not go back.  There was no incident

18   that occurred at that hooky party for him to report because

19   they left.

20   Now, Mr. Vindell said that Mr. Gomez said call

21   "Pasano."  Well, he did.  But Mr. Vindell said that he,

22   Mr. Vindell, "Nica", told "Pasano" to bring the gun.  He never

23   told you in his testimony that Mr. Gomez told him to call the

24   other individual and tell him to come here with a gun.  That

25   was Mr. Vindell's own decision, his own testimony of what

Nicole M. Warren, CSR, RMR, CRR

the Government and that they have failed to prove their case,
every one of these charges against Mr. Gomez, by their burden
of proof which is proof beyond a reasonable doubt.

Thank you very much.

MR. JONES:  Good afternoon, ladies and gentlemen.  I'm
going to try to be brief.  It's been a long day.  What I want
to do is just respond to a few things that defense counsel just
said about the proof in this case, about what the Government
has shown you.

Mr. Burwell said it.  Mr. Auster said it.  What I say
isn't evidence.  This right here, these transcripts, what you
heard from that witness stand, this is evidence.  If you want
to hear something, this young woman here has been taking down
every word that's been said.  You can ask to have it read back
to you.  So, when Mr. Auster tells you what somebody said
during the course of this trial, well, he can say that.

That's the evidence of what these people say.

So, when he tells you that the defendant really wasn't
a leader, that he didn't really have much of a role in this
gang -- and by the way.  Now at the end of this week, now they
concede the defendant is a gang member.  So, that's out of the
way.  He's a gang member, but he's not a leader.  He's just a
soldier.  Okay.

Well, let's look at what Mr. Vindell said at 467,
line 6.

Nicole M. Warren, CSR, RMR, CRR